**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AMERICAN MANUFACTURING COMPANY OF TEXAS, Respondent.**

**No. 21018.**

United States Court of Appeals
Fifth Circuit.

Sept. 14, 1965.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, Atty., Arnold Ordman, Gen. Counsel, Melvin J. Welles, Atty., N.L.R.B., Washington, D. C., for petitioner.

Karl H. Mueller, Harold E. Mueller, Mueller & Mueller, Fort Worth, Tex., for respondent.

Before BROWN and WISDOM, Circuit Judges, and ESTES, District Judge.

1. American Manufacturing Company of Texas.

2. 29 U.S.C.A. § 158(a) (1), (3) and (5).

JOHN R. BROWN, Circuit Judge:

In this petition of the Board for enforcement of its order, we deal with the problem of a § 8(a) (5) failure to bargain from the Employer's [1] contracting out all of its extensive transportation activities at least partially from anti-union motivation. We enforce with some modification for remand.

The Board, finding that certain labor practices by the Employer constituted a violation of § 8(a) (1), (3), and (5) of the Act,[2] entered in November 1962 its usual cease and desist order with the customary order to bargain with the Union [3] upon request. But it further ordered the Employer to take the following affirmative action:

1. Resume trucking operations which had been discontinued in June 1961 (followed shortly by sale of all trucks and equipment);

2. Offer reinstatement to all discharged drivers to their former or substantially equivalent positions; and

3. Pay drivers back pay from date of discharge with interest at 6 percent per annum.

We think the record is clearly sufficient to support the findings of the violations. But based upon this record, we conclude that the particular order requiring the Employer to resume trucking operations is unwarranted. We therefore enforce in part and reverse in part for further hearing, reconsideration and findings by the Board.

The Employer is a manufacturer of oilfield pumping equipment. For many years prior to this proceeding, it had maintained an extensive transportation department for the delivery of its products to customers scattered throughout the United States and Canada, many at remote places, well sites and the like. Although this transportation was exempt as private carriage under the Interstate

3. Local 47, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Commerce Act,[4] physical operations, safety, drivers, etc. were subject to the regulations of the Interstate Commerce Commission. The Employer in 1958 was convicted of violating the Motor Carrier Safety Regulations established by the ICC and was fined $1,000 and placed on probation for one year. Apparently for a time thereafter it complied with such regulations. But this was short lived and soon the Employer reverted to its former, flagrant practices. Due to the continued violations, the ICC, on March 29, 1960, again started investigation of the Employer's transportation operation. Adding to its problems, the Employer was under critical investigation by the Department of Labor for Walsh-Healy transportation wage violations. Apprehending that the long, and heavy, arm of the law (federal) was about to fall, the Employer on April 1, 1960, posted a notice to the drivers that all further trucking operations must comply with ICC regulations. Apparently fearing that compliance with driver hours, time off, etc., provisions of the ICC Rules might affect their earnings, some of the Employer's truck drivers then began discussions with Local 47 of the Teamster's Union. By April 10 a majority of the drivers had signed cards authorizing the Union to act as their bargaining agent. Shortly thereafter and on April 11, the Union notified the Employer of its majority status and requested recognition as the bargaining agent for the drivers. The Employer made no response. Subsequent to the Union's request for recognition, on April 18 Ben Barnett, who had been acting as foreman of the transportation department for a long time, was demoted by the Employer to his old job as driver. He was replaced by Lum Phifer who for many years had been the transportation foreman, but in 1959 had been assigned to presumably critical duties as a scrap steel buyer in the face of an imminent steel strike. Here began Phifer's feverish anti-union propagandizing about which more is later said. Still giving no recognition to the Union, the Employer, on May 17, called a meeting of all the drivers for direct dealing with them. Significant, unilateral alterations of wages, working and trucking conditions were announced,[5] all apparently to get in compliance with the ICC.

This brings us to the decisive action of June 18 again taken without consultation or discussion with the Union. On that date the Employer posted a notice to the drivers that the transportation department was being abolished, and that all of its motor truck transportation would be performed by C. & H. Transport Co., a certificated non-scheduled carrier. Of three of the drivers, apparently selected on a seniority basis, two accepted tendered employment. All other drivers were laid off. Thereafter in September the Employer sold all its trucks and related equipment. It was now out of the transportation business. Or so it thought.

■ Examining this order, we start with the proposition that the Board had ample basis for finding the § 8(a) (1) violation. The Board had to go no further than Phifer.

Starting with Phifer, the first question is why Phifer got into the act at all. Plant Superintendent Emmons, explaining to Barnett why he was being replaced by Phifer, made the reason plain:

"I said, 'Well, Frank is there anything I have did? What have I did wrong?' He said, 'Ben, [Barnett] did you know the Union had signed

---

4. See United States v. Drum, 1962, 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360; Agricultural Transportation Assoc. v. King, 5 Cir., 1965, 349 F.2d 873.

5. Most significant was the requirement that on many trips, the drivers travel double. This was to permit one driver to sleep while the other drove, thus enabling the Employer to met delivery schedules and also comply with the ICC driving-sleep Rules. Drivers were also given a ½¢ per mile pay increase on "single haul" trips and an illusory 1¢ per mile increase on "double hauls", since on "double hauls" the two drivers shared the total pay equally resulting in their making less than formerly.

up all the drivers?' and I said, 'No, sir, I sure didn't.' And he said, 'Well, they have, They are signed up, lock stock and barrel, * * *' And he said, 'Lum [Phifer] is coming back up there taking over * * * Evidently the old man thinks he can break the union hold,' or something to that effect."

This was more than enough to reject the Employer's claim that he was put there to straighten out the ICC problem.

▮ And once they put Phifer in command of the transportation department, he, as a supervisor, was management's voice,[6] until repudiated, whether what he was saying was with its approval or whether it had instructed him to do (or say) so. "If an employee, * * *, is clothed with the apparent authority to speak for the employer, it is not necessary to prove that the employer had actual knowledge of the acts committed by the employee; * * *." NLRB v. Birmingham Publishing Company, 5 Cir., 1959, 262 F.2d 2, 8. Undoubtedly sincere, he broke every rule in the book—the now big book on 8(a) (1) coercive statements which do not come under the important protection of free speech. 29 U.S.C.A. § 158(c). Driver after driver testified that Phifer, questioning them about the Union and urging them to withdraw from it, stated positively that if they did so he might be able to get them a pay raise. Worse, he frequently voiced the threat that Gourley, Employer's President, would sell the trucks rather than have the Union.[7] And as though these efforts were not enough, he openly suggested a counter petition to the then pending petition for certification of the Union.[8] Of course all know by now that § 8(a) (1) "* * * makes it unlawful for an employer to instigate and promote a decer-

tification proceeding or induce employees to sign any other form of union-repudiating document, particularly where the solicitation is strengthened by express or implied threats of reprisal or promises of economic benefit." NLRB v. Birmingham Publishing Co., 5 Cir., 1959, 262 F.2d 2, 7, and cases there cited.

Of course this finding of flagrant § 8(a) (1) violation cuts through this whole case. And its first impact is on the contention that the reason there was no bargaining, no recognition, no unfair labor practice, is simply that there was no duty because, in turn, there was a good faith doubt on the Union's status.

▮ Despite the confusion as to the scope of the proposed unit, the evidence is quite sufficient to show a known, demonstrated majority of over-the-road drivers had signed union authorization cards. This unit corresponded to the Employer's actual groupings, and it is the unit now named in the order. We find nothing in the record which required the Board to hold that the Employer harbored a good faith doubt of the Union's status. Quite apart from the Union's letter declaring its majority support and requesting recognition, the Plant Superintendent let the cat out of the bag when, in referring to the drivers, he stated to Barnett "they are signed up lock stock and barrel." The Employer gains nothing on this record from the Board's dismissing the representation proceeding. An election is not required merely because it was sought. See United Mine Workers of America v. Arkansas Oak Flooring Co., 1956, 351 U.S. 62, 71–72 (and cases cited at 72, n. 8), 76 S.Ct. 559, 100 L.Ed. 941; NLRB v. Southeastern Rubber Mfg. Co., 5 Cir., 1954, 213 F.2d 11, 15. Moreover, an election would have been a futility after June 18 when

---

6. NLRB v. Houston Chronicle Publishing Co., 5 Cir., 1962, 300 F.2d 273, 280.

7. This testimony is typical:
   "Well, I'll tell you, I don't think you boys want the union * * * It won't be any good for you.
   "* * * I'll tell you one thing * * * if you all go ahead and go union * * *

the old man [referring to Mr. Gourley] will sell all of the trucks and you all will be out of a job."

8. Phifer was quoted as saying: "* * * Why don't you all talk it over among yourselves and get a letter written and send it in and get this election cancelled? I believe you would be a lot better off."

the drivers were discharged—and, so the Board found, discharged because of the very effort to obtain union recognition.

With the duty to bargain commencing not later than mid-April, little need be said about the § 8(a) (5) violations as to other than contracting out the transportation.

■ Whether motivated by anti-union purpose or as a reflex to the hot breath of the ICC, the simple fact is that the changes in wages, working and trucking conditions of May 17 (see note 5, supra), made unilaterally and without so much as a gesture toward a union concern in these decisions, constituted a classic, albeit sometimes technical, refusal to bargain. NLRB v. Katz, 1962, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230; NLRB v. Tex-Tan, Inc., 5 Cir., 1963, 318 F.2d 472, 482. This brings us to the § 8(a) (3) finding as a prelude to the § 8(a) (5) contracting out. The motivation for this decision presents the most substantial problem in the case. The Board found, contrary to the Trial Examiner,[9] that the purpose to be served by such action was to enable the Employer to rid itself of the Union, and thus was a violation of § 8(a) (3) and (1).

Refuting the Board's finding that the decision to contract out the transportation work was anti-union motivated, the Employer contends that such steps were taken because it could not comply with the ICC regulations, continue to make timely delivery of its products, and make a profit. Consequently on advice of counsel that the imminent penalty for pre-vious noncompliance might be less severe if the Employer were no longer engaged in any type of hauling operation, it took this step.

■ We readily credit the Employer's genuine desire to alleviate its ICC problems. So we do as to the reasonableness of the judgment that eliminating its transportation department would be the best way out. But to have a perfectly good motive genuinely followed is not enough if, on the facts, the motivation was twofold, with one being a purpose to eliminate the Union. For the law has long recognized that an employer who terminated and subcontracts part of its operation to prevent employee unionization violates § 8(a) (3).[10] This gets fresh support from Textile Workers Union of America v. Darlington Mfg. Co., 1964, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827. There an Employer was charged with a violation of § 8(a) (3) for closing one of its plants for anti-union purposes. The Court said:

"* * * a partial closing is an unfair labor practice under § 8(a) (3) if motivated by a purpose to chill unionism * * * and if the [E]mployer may reasonably have foreseen that such closing will likely have that effect."

■ The problem then is whether there is credible, substantial evidence to support the Board's conclusion that—in part at least—the contracting out was to solve Union and ICC problems.

We need not detail the evidence. Here again § 8(a) (1) cuts sharply. According to the Plant Superintendent, Phifer

---

9. The Examiner did find, however, that contracting out with no prior discussion was a unilateral change constituting another § 8(a) (5) violation. But this was a sterile conclusion since in Part V, The Remedy, he declined to order bargaining since he found no § 8(a) (3) anti-union motivation.

10. Bon Hennings Logging Co. v. NLRB, 9 Cir., 1962, 308 F.2d 548, 553-554; NLRB v. U.S. Air Conditioning Co., 1 Cir., 1962, 302 F.2d 280, 282; NLRB v. Kelly & Picerne, Inc., 1 Cir., 1962, 298 F.2d 895; NLRB v. Brown-Dunkin Co., 10 Cir., 1961, 287 F.2d 17, 19; NLRB v. Missouri Transit Co., 8 Cir., 1957, 250 F.2d 261, 262; NLRB v. New Madrid Mfg. Co., 8 Cir., 1954, 215 F.2d 908; NLRB v. Norma Mining Corp., 4 Cir., 1953, 206 F.2d 38, 41-42; NLRB v. Brown-Dunkin Co., 10 Cir., 1961, 287 F.2d 17, 19 and see cases there cited p. 19, n. 1; Town & Country Mfg. Co. v. NLRB, 5 Cir., 1963, 316 F.2d 846, 847.

was put back in the department to bust the Union. He did a lot of talking in the process. And Phifer turns out to have been a good prophet. He warned (a) unionize and (b) management sells the trucks. When (a) happened, (b) came to pass. His own conduct, some of it in the presence of very top management, justified the Board's conclusion that he replaced Barnett because of Union problems, not the ICC. Proof of that pudding was further found in the fact that the ICC regulations continued to be pretty generally ignored until, perhaps, the May 17 change over to double drivers (see note 5, supra).

The Board could find that to the Employer, the way to beat the Union was to ground the drivers. And to drive them from the road, it would cease transportation, henceforth relying on public carriers.

■ Of course it is now clear that the Board was correct in finding that the Employer must negotiate the decision to subcontract. Quite apart from anti-union conduct, or here the claim of economic justification, the decision to subcontract work is a subject for mandatory bargaining. Any doubt which may have existed was put to rest by Fibreboard Paper Products Corp. v. NLRB, 1965, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233. There the Court stated the issue: "Was [employer] required by the National Labor Relations Act to bargain with a union representing some of its employees about whether to let to an independent contractor for legitimate business reasons the performance of certain operations in which those employees had been engaged?" In response, the answer was emphatic: " * * * the type of 'contracting out' involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment —is a statutory subject of collective bargaining under § 8(d)." 379 U.S. at 215, 85 S.Ct. at 405, 13 L.Ed.2d at 241.

■ We turn now to the scope and terms of the Board's order mindful that § 10(c) "charges the Board with the task of devising remedies to effectuate the policies of the Act." National Labor Relations Board v. Seven-Up Bottling Co. of Miami, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed.2d 377, 381. We agree that all particulars of the Board's order are fashioned to that end save one.

■ We express much doubt at this stage that the part of the order requiring the Employer to resume trucking operations is reasonably needed to effectuate the Act. This is not the simple case where resumption of the former operation is little more than the old employee picking up the broom and starting to sweep where the contractor left off. We are here concerned with an order, which if enforced, would require an Employer to purchase a fleet of trucks and all related equipment necessary to operate a large transportation department. This involves a substantial capital outlay of not less than $150,000, a factor which would normally be irrelevant in imposing sanctions for past misdeeds.

■ But it is not irrelevant—for the very reason that the Act, save for some jurisdictional disputes, 29 U.S.C.A. § 160(k), is still based on voluntary bargaining. To require bargaining is not to require a bargain. The Employer has, we hold, violated the Act in several particulars. But it is not an outlaw. When it bargains, it must do so in good faith. But on this major issue, it may bargain to the bitter end of a real impasse. Thus, with a new fleet of unwanted trucks on its hands, it might, and quite legitimately could, renew its determination to use public carriers. As with Christmas bonuses, it might turn out to be all bargaining— no bargain, no bonus; no trucks, no truck drivers. See NLRB v. Citizens Hotel Co., 5 Cir., 1964, 326 F.2d 501; General Telephone Co. of Florida v. NLRB, 5 Cir., 1964, 337 F.2d 452; NLRB v. Exchange Parts Co., 5 Cir., 1965, 339 F.2d 829. Since we order back pay and reinstate-

ment of the employees,[11] the Union has persons to bargain for. It does not need trucks to bargain for the men. And in the absence of record facts justifying it, we do not see why the Union should be given the economic pressure of this tentative, perhaps momentary, but nonetheless mandatory investment as an aid to the bargaining.

This factor demonstrates that deferring the resumption of trucking operations does not really leave the Union out of the relief accorded. According wide latitude to the Board in shaping relief, we have, in a number of different situations, required that the " * * * order must find adequate support in the record." NLRB v. Local 926, Int. Union of Operating Eng., 5 Cir., 1959, 267 F.2d 418, 421; Communication Workers of America, etc., Local 4372 v. NLRB, 1960, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896; NLRB v. Dallas General Drivers, etc., Local Union 745, 5 Cir., 1960, 281 F.2d 593; NLRB v. Lamar Creamery Co., 5 Cir., 1957, 246 F.2d 8; Shell Oil Co. v. NLRB, 5 Cir, 1952, 196 F.2d 637; NLRB v. Ford Motor Co., 5 Cir., 1941, 119 F.2d 326. In exacting that here, we do not hold that the Board could not properly impose such a remedy. We hold merely that it lacks necessary support in this record. We are unable to find in this record evidence that such a coerced investment is reasonably needed to effectuate the policies of the Act.

We therefore grant enforcement of the cease and desist order and the portions requiring immediate reinstatement of the employees with back pay (plus interest) computed in the manner prescribed by the Board's order. This includes, of course, the mandatory duty to bargain. But we remand to the Board that phase of the order requiring resumption of operations for further consistent proceedings.

In this remand we do not undertake to blueprint how or when the Board shall conduct it. Our purpose is to allow fullest latitude to the Board, so that such hearings and decisions on this important aspect as might be appropriate may be held without interfering with the enforcement of the balance of the order. Our expressions of concern leading to this remand are not a forecast of what the decision should, or must, be. That is for the Board initially.

Enforced in part; modified and remanded in part.

---

11. Reinstatement is unavoidably tied to the final bargain if any. If the Employer lawfully adheres to the decision to use public carriers, it is quite conceivable that all or some of the men will lose future employment just as they might have had the bargaining taken place before the June 18 action.