NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WINN–DIXIE STORES, INC.,
Respondent.

No. 22433.

United States Court of Appeals
Fifth Circuit.

May 19, 1966.

Jones, Circuit Judge, dissented.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

O. R. T. Bowden, Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before PHILLIPS,* JONES and BROWN, Circuit Judges.

PHILLIPS, Circuit Judge:

This is a proceeding to enforce an order of the National Labor Relations Board.[1] Winn-Dixie Stores, Inc.,[2] the respondent, owns and operates a multistate chain of public food markets. It has eight divisions. Each is a complete operational unit, performing all the functions of buying and merchandising including warehousing. The head of each division has final authority with respect to administration and policy in his division. Winn-Dixie also maintains what is known as a headquarters staff, composed of specialists in the field of public market operations and merchandising, including transportation and warehousing. These specialists travel throughout Winn-Dixie territory and elsewhere, observing methods employed in Winn-Dixie stores and other like stores, carry on studies, and make recommendations to the several divisions. The division head

---

* Of the Tenth Circuit, sitting by designation.

1. Hereinafter called the Board.

2. Hereinafter referred to as Winn-Dixie.

may adopt or not adopt such recommendations.

We are here concerned only with the Jacksonville Division of Winn-Dixie, which embraces 95 stores, located in north, central, and western Florida and southern Georgia. J. W. Nease, a vice-president of Winn-Dixie, was the head of the Jacksonville Division.

In September, 1961, the Meat Cutters, Packinghouse and Allied Food Workers Union, Local 433,[3] began a drive to organize an appropriate unit of the meat processing, meat packaging and cheese packaging employees in Winn-Dixie's Jacksonville warehouse.

On October 26, 1961, the Union had obtained authorization cards from 22 of the 34 employees in that unit and on that date advised Winn-Dixie of its status as representative of the unit and requested recognition. On November 2, 1961, the Union sent Winn-Dixie a list of the names of the employees who had signed authorization cards. On November 3, 1961, Winn-Dixie advised the Union that it did not believe the Union represented a majority of the employees in the unit and refused recognition unless and until certified by the Board. Thereupon, the Union posted a list of the names of the employees who had signed cards on the bulletin board in the warehouse. Winn-Dixie supervisors urged the employees to scratch their names from the list and engaged in other unfair labor practices. That resulted in an unfair labor practice case before the Board,[4] which culminated in an order of the Board, dated October 3, 1962, directing Winn-Dixie to bargain with the Union. On March 27, 1963, the Board filed in this court its petition for enforcement of that order. On November 19, 1963, this court ordered enforcement of the Board's order. Winn-Dixie Stores, Inc., 138 NLRB 1355, N. L. R. B. v. Winn-Dixie Stores, Inc., 5 Cir., 324 F.2d 502.

Following the advent of open-air refrigeration display cases, marked changes took place in the merchandising of perishable foods, meats, cheese and like products, especially in the prepackaging of them for display and sale to the ultimate consumer.

In 1940, Winn-Dixie started packaging cheese in transparent wrappers, using cellophane, saran, or other transparent material and displaying it in open-air refrigerator display cases.

In early 1961, the Jacksonville Division, after some experimentation, began a cutting and wrapping of natural cheese operation in its warehouse at Jacksonville, to provide random-weight packaged cheese for the stores in that division. It purchased natural cheese in blocks of 40, 60, or 640 pounds, sliced it in random sizes or weights to give a customer a selection as to size of package, hand-wrapped it in plastic film carrying Winn-Dixie's label, sealed it with heat, weighed the package, and marked the weight and price on the package.

In 1962 and early 1963, the headquarters staff questioned the operation at the Jacksonville warehouse. By October, 1962, the other divisions were buying all their prepackaged random-weight natural cheese from cheese firm processors and finding it very satisfactory. After the Jacksonville Division had made an analysis and study of its warehouse operation, it decided in April, 1963, that from a cost, as well as a merchandising standpoint, it would be more advantageous to purchase prepackaged random-weight natural cheese from cheese processors. About April 12, 1963, the Jacksonville Division, for lawful business reasons, discontinued its warehouse cutting and prepackaging of cheese and thereafter procured prepackaged random-weight natural cheese from Kraft and other cheese processors. The instant case arises out of the discontinuance by Winn-Dixie of its cheese cutting and pre-

3. Hereinafter called the Union.

4. In that proceeding the examiner found that the respondent desired to postpone, if not entirely evade, its duty to bargain with the Union and had no intention to bargain.

packaging operation in its warehouse at Jacksonville.

At the time it closed such operation, the Jacksonville Division had 10 employees in its warehouse cheese prepackaging operation. It transferred four of such employees, all men, to its beef processing operation and advised the other six employees, all females, that they were being laid off permanently. It did not advise the Union it was about to discontinue its cheese packaging operation, and neither did it discuss with the Union the closing of the operation, or whether the six employees laid off could be transferred to other jobs with Winn-Dixie. All but one of the six had theretofore worked in Winn-Dixie stores.

The six employees laid off inquired as to whether they could be transferred to other jobs and were advised if there was an opening they would be called. At the time of the hearing, they had not been offered other employment. The manager of the Jacksonville Division testified that respondent had studied the matter of suitable spots for such six employees, but had been unable to find jobs for them.

The Union representative did not discuss the matter with respondent, because he believed it would be futile to do so.

Based on charges that Winn-Dixie, at its Jacksonville Division, had failed to bargain with the Union before closing its warehouse cheese prepackaging operation, a complaint was filed against Winn-Dixie, in which it was alleged that respondent had refused to bargain with the Union as the representative of the employees in the bargaining unit, composed of the employees in the meat and cheese processing and packaging operation in the Jacksonville warehouse, and that on April 12, 1963, it had unilaterally discontinued its cheese cutting and prepackaging operation and unilaterally transferred four of its employees in such operation and terminated the employment of six of its employees in such operation.

Sliced natural cheese is a highly perishable product. It is subject to contamination by mold, rendering it unfit for food. The mold is caused by bacteria in the air, on the clothes or persons of employees, or on other things with which the cheese comes in contact.

In 1961, the Kraft Food Company constructed and has since operated a plant at Booneville, Mississippi, devoted solely to cutting and packaging random-weight natural cheese and things incidental to such an operation.

The cheese is cured in blocks of 40, 60, or 640 pounds. They are stored in coolers where proper temperature is maintained. Before being removed to the cutting room the blocks are cleaned and any discoloration and any mold is removed. The blocks are clean and free from contamination when they enter the cutting room. The cutting room is closed and the air therein filtered and maintained at a constant temperature. Sanitary precautions are taken with respect to the employees who handle the cheese. They wear white coats. The air in the room is sprayed periodically with a solution to kill bacteria. The cheese is cut with an air operated wire cheese cutter, which operates automatically, and the cut portions are deposited on a roll of paper. The cut cheese is then handwrapped in transparent material. In that final operation, the interior of the package is flushed with inert gas to force out the oxygen and any mold bacteria in the package. The gas flush is a patented process. Kraft owns the patent. The result is a packaged cheese that will have a shelf life, that is, a freedom from mold, for 60 days. Kraft guarantees a 60-day shelf life.

Cutting the cheese in random weights gives a customer a wider selection with respect to the amount of cheese he purchases.

Only center cuts are used. End cuts are not packaged. Crumbs are produced when blocks of cheese are cut. Kraft utilizes the crumbs and avoids loss from crumbling.

Because of the longer shelf life, larger stocks can be carried on display shelves and understocking avoided.

Kraft placed Winn-Dixie labels on the natural cheese it prepackaged for Winn-Dixie and stamped the weight and the price fixed by Winn-Dixie on each package.

While Winn-Dixie endeavored to maintain sanitary conditions where it carried on its cutting and packaging of its natural cheese at its Jacksonville warehouse, the cheese it cut and prepackaged had a shelf life of only 10 to 12 days. As a result, its shelves at times were under-stocked and it suffered losses of cheese from mold. It was not able to utilize cheese crumbs and the crumbs were a total loss. It also packaged end cuts.

At the time the Jacksonville Division discontinued its cutting and prepackaging of cheese, the price of natural cheese prepackaged by Kraft and other processors had been reduced because of growing competition among the processors, and the Jacksonville Division could purchase prepackaged cheese from Kraft at substantially less cost than the cost of the cheese purchased by the Division in blocks and prepackaged by it. Longer shelf life enabled the Division to maintain adequate stocks on its shelves without danger of loss from mold, which made for better merchandising, increased sales, and larger profits.

It was not practical or economically feasible for the Jacksonville Division, with its comparatively small operation, to install the means, processes and practices to maintain sanitary conditions in a cutting and prepackaging plant, like Kraft did in its Mississippi plant.

The trial examiner found that uncontroverted evidence established that the respondent "discontinued its cheese operation for sound business reasons, namely, the adoption of a new, better and more economical method for merchandising its prepackaged cheese products to the public, rather than any opposition to organization." The Board concurred in that finding. But the examiner found, as did the Board, that respondent violated "Section 8(a)(5) and (1) of the Act when it discontinued the cheese operation without prior notice to, or consultation with, the Union." The examiner also found that "the discharges were not violative of Section 8(a)(3)." The Board made no finding with respect to a violation of § 8(a)(3).[5]

The order of the Board contained the usual negative provisions. It did not require the reestablishment of respondent's cheese operation at the Jacksonville warehouse. It ordered that the respondent take the following affirmative action:

"(a) Offer to, and upon request, bargain collectively with, the Union concerning the resumption of its cheese processing and packaging operation, and if no agreement is reached with respect thereto, bargain collectively with the Union concerning the effects of the discontinuance of its cheese processing and packaging operation on the employees in the above-described unit.

"(b) Make Flo Heasley, Ossie Leggett, Mabel Morrison, Polly Ramsey, Evelyn Spillers, and Patricia Spires whole for any loss of pay suffered by them [6] * * *."

It also contained the usual requirements respecting the posting of notices and reporting of steps taken to comply with the order.

It will be noted that the earlier decision and order of the Board, by which it certified the Union as the bargaining

5. The examiner did not recommend re-establishment of the discontinued operation or the reinstatement with back pay of the six employees whose employment was discontinued.

6. The order provided that the back pay liability should cease upon the occurrence of any of the following conditions: "(1) reaching mutual agreement with the Union relating to the subjects which Respondent is herein required to bargain about; (2) bargaining to a *bona fide* impasse; (3) the failure of the Union to commence negotiations within 5 days of the receipt of the Respondent's notice of its desire to bargain with the Union; (4) the failure of the Union to bargain thereafter in good faith."

agent of the employees in the unit, found Winn-Dixie had violated § 8(a)(5) of the Act by failing to bargain with the Union, and ordered it so to bargain, was entered October 3, 1962; that Winn-Dixie did not assent to such certification and refused to comply with the order to bargain; that on March 27, 1963, the Board filed its petition in this court for enforcement of that order; that this court, on December 13, 1963, handed down its decision that such order should be enforced; and that the failure to bargain, upon which the order of the Board in the instant case is based, occurred during the period the proceedings for enforcement of the earlier order were pending in this court.

Winn-Dixie contends it was under no duty to bargain with the Union during the pendency of such proceedings. Section 10(g) of the Act (29 U.S.C.A. § 160(g)) expressly provides: "The commencement of proceedings under subsection (e) or (f) of this section shall not, unless specifically ordered by the court, operate as a stay of the Board's order."[7]

■ We hold Winn-Dixie was not relieved of its duty to obey the order to bargain during pendency of the proceedings to enforce the earlier order.[8]

In N. L. R. B. v. American Manufacturing Company of Texas, 5 Cir., 351 F.2d 74, the facts were these: American was a manufacturer of oil field pumping equipment. For many years prior to 1960, it had maintained a motor truck transportation department, by means of which it delivered its products to its customers throughout the United States and Canada. On April 10, 1960, Local 47 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America[9] became the bargaining representative of the truck drivers in American's transportation department. On April 11, 1960, Local 47 notified American of that fact. On June 18, 1960, without discussion or consultation with Local 47, American posted a notice to the drivers that the transportation department was being abolished and that all of its motor truck transportation would be performed by C. & H. Transport Company, a certified, nonscheduled carrier. Two of the truck drivers accepted other tendered employment. One refused other tendered employment. All the others were laid off. Thereafter, and in September, 1960, American sold all of its trucks and related equipment. The Board found American guilty of unfair labor practices and ordered it to "(1) Resume trucking operations which had been discontinued in June 1960; (2) Offer reinstatement to all discharged drivers to their former or substantially equivalent positions; and (3) Pay drivers back pay from date of discharge * * *."

In holding the order, as modified by the court, should be enforced, the court at page 80 in part said:

"Of course it is now clear that the Board was correct in finding that the Employer must negotiate the decision to subcontract. Quite apart from anti-union conduct, or here the claim of economic justification, the decision to subcontract work is a subject for mandatory bargaining."

In the instant case, we think when Kraft or another processor receives an order from Winn-Dixie for sliced and prepackaged natural cheese and the processor selects a block or blocks of cheese to be sliced and prepackaged in containers bearing Winn-Dixie's label, with the weight of the package to be indicated thereon and with the price as directed by Winn-Dixie to be stamped thereon, the block or blocks of cheese so selected become appropriated to the Winn-Dixie

---

7. Subsection (e) provides for proceedings to enforce the Board's order in a court of appeals of the United States and subsection (f) for a review of a final order of the Board in such a court of appeals in behalf of any person aggrieved thereby.

8. See Old King Cole, Inc. v. N.L.R.B., 6 Cir., 260 F.2d 530, 532.

9. Hereinafter called Local 47.

purchase contract. We think the situation is materially different from one where a processor offers and sells prepackaged natural cheese bearing the processor's label to retail purchasers generally. Had Winn-Dixie purchased blocks of natural cheese and employed a processor as an independent contractor to slice and prepackage it in packages bearing its label, with the weight and the price directed by Winn-Dixie stamped thereon, there could be no doubt the processor would be performing the same work as Winn-Dixie had theretofore performed with its own employees in its warehouse. We see no material difference in the case we have just hypothesized and the facts in the instant case, after the processor selects the block or blocks of cheese to fill a Winn-Dixie special order. Likewise, we see no material difference in the facts in the instant case and the *American Manufacturing Company* case, if, as indicated in the opinion in the latter case, anti-union conduct and economic justification may be laid aside in reaching the ultimate decision.

While there was a duty on the part of Winn-Dixie to consult and bargain with the Union as the employees' representative before discontinuing its cheese cutting and prepackaging operation at its Jacksonville warehouse, we do not think at this late date it should be required to bargain with the Union as to its reestablishment. That, because under the facts proven by uncontradicted evidence, we think Winn-Dixie, for good and sufficient reasons, would undoubtedly refuse to reestablish such operation and that to bargain with respect to such reestablishment would be a mere "exercise in futility."[10] The order should be modified so as to eliminate that requirement.

On the authority of the *American Manufacturing Company* case, which we feel

impelled to follow, the order of the Board as so modified will be enforced.

So ordered.

JONES, Circuit Judge (dissenting):

The facts, as stated by the majority, appear to me as the disclosure of a situation clearly within the exclusive prerogatives of management in all of its phases. Therefore, I dissent.

---

10. See N.L.R.B. v. American Manufacturing Company of Texas, 5 Cir., 351 F.2d 74, 81.