**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TRANSMARINE NAVIGATION CORPORATION and its subsidiary, International Terminals, Inc., Respondent.**

**No. 20964.**

United States Court of Appeals
Ninth Circuit.

June 21, 1967.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Marsha E. Swiss, Attys., N.L.R.B., Washington, D. C., Ralph P. Kennedy, Director, N.L.R.B., Los Angeles, Cal., for petitioner.

L. Robert Wood, Francis J. MacLaughlin, Lillick, Geary, McHose & Roethke, Los Angeles, Cal., Sokol, Fishman & George, Beverly Hills, Cal., for respondent.

Before BARNES and ELY, Circuit Judges, and PECKHAM, District Judge.

PECKHAM, District Judge:

The National Labor Relations Board (hereinafter "Board") has petitioned this Court for enforcement of its order issued against Respondent on May 28, 1965, following proceedings under Section 10 (c) of the National Labor Relations Act (hereinafter "Act") as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.). The Board's decision and order are reported at 152 N.L.R.B. 998. This Court has jurisdiction over the proceedings under section 10(e) of the Act, 29 U.S.C. § 160(e), since the alleged unfair labor practices occurred at Los Angeles, California, within this judicial circuit.

Respondent Transmarine Navigation Corporation and its wholly owned subsidiary, International Terminals, Inc., (hereinafter "Company"), operated as a freight agent, ship broker, steamship agent, and terminal operator at Wilmington in the Los Angeles Harbor. In February, 1960, the American Federation of Guards, Local #1 (hereinafter "Union") was certified by the Board as the collective bargaining representative of the guard unit whose members were employed by the Company to protect cargo on the ships and in the warehouses on the dock. Since that time a collective bargaining agreement has governed relations between the Company and the Union. The most recent agreement was executed in 1962 and, with an expiration date of June 30, 1965, was still in effect at the time of the events described herein.

It appears from the testimony of the Company's vice president that during the summer of 1963, the Japanese Government ordered a consolidation of Japanese shipping companies into fewer, larger companies. This order affected the Company's principal customer, a Japanese shipowner. The consolidation created the need for larger shipyard facilities to service the new lines. In August, the Company entered into discussions with two other terminal operators about forming a joint venture to provide expanded facilities in the Long Beach Harbor. The joint venturers expected that a larger facility would attract one or more of the new merged shipping lines.

On September 5, 1963, the Company executed a joint venture agreement with Jones Stevedoring Company and California Maritime Services. Under this agreement, the Company was to terminate its operations in Los Angeles and relocate in Long Beach as a minority partner in a joint venture, to be known as Sierra Terminals. The Company and California Maritime Services were each to have a forty percent interest in Sierra Terminals, and Jones Stevedoring was to have the remaining twenty percent. At the time of the execution of the agreement, the Long Beach terminal facilities

were occupied by a company known as Twin Harbors, which had a contract arrangement with Newton Security Patrol to supply guards for the facility. When the September 5 agreement was executed, the Company did not know what the need for guards would be when the joint venture—Sierra Terminals—would begin operations.

On September 15, the vice president of the Company told Ernest McClintock, a guard, that the Company was thinking of closing its terminal in Los Angeles and of merging with companies in Long Beach. McClintock was asked to keep this confidential. About a week or ten days later, McClintock was told to advise the guards they would be terminated on or about November 1, 1963. On this occasion McClintock was told that the Sierra Terminals joint venture was going to use Newton Security Patrol at Long Beach for guard services. On or about October 15, the vice president told McClintock that he would talk to Newton and see what could be done with respect to the employment of the guards employed by the Company. Subsequently, McClintock was offered a job with Sierra Terminals; the other three guards employed on a permanent basis at that time were told that they would be called in when needed. This followed talks with Newton by both the vice president of the company and McClintock, at the vice president's suggestion. McClintock and the other guards declined Newton's offer of employment because at that time they were earning substantially higher wages than were offered by Newton. Two and possibly four of the guards then sought from the Company letters of recommendation, which the vice president testified he wrote.

In September 1963, McClintock had told Walker, the secretary-treasurer of the Union, that there were rumors that the terminal was going to be closed. Also, the record reflects that at this time there was some publicity in the local newspapers and trade journals with relation to the movement of the Company to Long Beach. However, the Trial Examiner found that there was no publicity concerning the termination of the guards at this time. In the latter part of October McClintock saw Walker of the Union and told him that the guards were going to be terminated.

On October 24, 1963, the Company, in a bulletin addressed to all employees and labeled as a report of company activities, advised the employees that they would be terminated as employees of the Company and would be offered employment by Sierra Terminals. The bulletin stated that this change would take place on November 1, 1963. Copies of these bulletins were not distributed to the guards because it was not customary for the guards to receive memoranda of this type, according to the testimony of the vice president of the Company.

On October 28, 1963, the vice president wrote a letter to Walker informing the Union that on October 31, the Company would cease business. The letter recited that the collective bargaining agreement would no longer be operative, as "this event [the closing] will terminate the employment of the guards who are members of your organization." The Trial Examiner found that this letter was the first direct communication from the Company to the Union about terminating the operations of the Company, and that there is no basis for a finding that the business manager of the Union was aware of the Company's decision to terminate the guards prior to the late October conversation with McClintock. The Trial Examiner concluded that after receipt of this letter, Walker, the Union representative, regarded a request to bargain as a futile gesture concerning the decision of the Company with respect to moving its facilities and the termination of the guards. He did seek to have the Company offer equivalent employment to the displaced guards but without success.

The Union filed the original charge in this action on February 7, 1964. The gravamen of the charge was that the Company had violated its bargaining obligation with the Union and on June 12, 1964, the Board issued a complaint on

that ground. On June 24, 1964, the Union's attorney wrote the Company suggesting a settlement. The Company, on June 25, replied that it was " * * * now and always have been willing to bargain about any matters in dispute."

In his discussion and concluding findings, the Trial Examiner found that "[t]he central fact establishing [the Company's] failure to comply with the mandate of the Act is that it executed a contract obligating it to leave its place of business and become a minority party to a joint venture without consultation with the Union." Accordingly, he found as a conclusion of law that "[b]y entering into an agreement with Jones Stevedoring and California Maritime on September 5, 1963, which affected the employment of the employees in the unit described * * * without consultation or bargaining with the Union, Respondent has committed unfair labor practices violative of Section 8(a) (5) and 8(a) (1) of the Act." The Trial Examiner recommended that the Company, in addition to posting the usual notice, make the guards whole for any loss of earnings which they suffered from the time of their discharges to June 25, 1964, the date on which the Company indicated to the Union that it would be "willing to bargain about any matters in dispute." He noted that the General Counsel had specifically disclaimed seeking a remedy restoring the status quo ante or giving employment to the displaced guards. Hence, the Trial Examiner did not consider the question of reemployment or reinstatement. He stated that under the circumstances of this case it would appear to be an "exercise in futility" to recommend that the Company and Union bargain concerning the shutting down of the terminal or the employment of the guards.

In affirming, the Board adopted the findings, conclusions and recommendations of the Trial Examiner with one addition which is not material here.

The Company then filed a motion for reconsideration, stating that since it "went out of business at the time these guards were discharged", an unfair labor practice finding and remedial order were barred under the holding in Textile Workers of America v. Darlington Manufacturing Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). *Darlington* issued two months before the Board's decision. Stating that the motion for reconsideration contained nothing not previously considered by the Board, the Board denied the Motion.

The principal issue on this petition for enforcement is whether the Company's decision, based solely upon greatly changed economic conditions, to terminate its business and reinvest its capital in a new joint venture to be located in a different location is a subject of mandatory bargaining within the meaning of 8(a) (5) and 8(d). The Board asserts that it is; the Company urges that it is not.

Initially, it must be emphasized that the Company's decision to discontinue its operations and relocate in a different area as a minority partner in a joint venture was dictated solely by valid business reasons. The General Counsel and the Board concede that the economic reasons for the cessation of the Los Angeles operations and the formation of the joint venture in Long Beach were valid, in that the inadequacy of the Company facilities in Los Angeles threatened the loss of the Company's main customer. In discussing the remedy, the Trial Examiner stated that the "record would not support a finding that the reason for moving was at least in part motivated by a desire to avoid the contractual obligations on the part of Respondent with the Union."

In support of its argument that the Company's decision to terminate and relocate its operations in a joint venture was a mandatory subject of collective bargaining, the Board relies principally upon the decision in Fibreboard Paper Products Corp. v. N.L.R.B., et al., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) and the cases following it. We do not find that case to be controlling. In *Fibreboard*, the employer was concerned with the high cost of its maintenance

operation. To achieve economies, the employer decided to replace its existing union employees with those of an independent contractor to do the same work under similar conditions of employment for the same employer in the same plant. In holding this decision to subcontract to be a mandatory subject of collective bargaining, the Supreme Court stated:

"The facts of the present case illustrate the propriety of submitting the dispute to collective negotiation. The Company's decision to contract out the maintenance work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." 379 U.S. 203, at 213, 85 S. Ct. 398, at 404.

The Court emphasized that the facts in that case dictated the holding that the decision to subcontract in those circumstances was a mandatory subject of collective bargaining. Accord, N.L.R.B. v. Johnson, et al., 368 F.2d 549 (9th Cir. 1966).

Here, the Company, in deciding to join Sierra Terminals, made fundamental changes in the direction and operation of the corporate enterprise, which greatly affected its capital, assets, and personnel. The Company became a minority partner in Sierra. Sierra has three times the former employees of the Company, some who work in capacities which did not exist in the Company, such as longshoring. The Company had $40,000 of working capital at the Los Angeles facility, whereas Sierra has two and one-half times that amount. Sierra has far larger and more modern terminal facilities which service a larger shipping line of approximately ten times the size of the Company's former customers. Further, Sierra needs only two guards as a result of its more modern facilities in Long Beach, whereas the Company used from four to six guards at the older facility in Los Angeles. Finally, the decision here brought about a major commitment of capital and a fundamental alteration of the corporate enterprise; unlike *Fibreboard,* it was not merely a decision to achieve economies by reducing the work force and fringe benefits of the union. Cf., N.L.R.B. v. Royal Oak Tool & Machine Co., 320 F.2d 77 (7th Cir. 1963). As Mr. Justice Stewart, in a separate concurring opinion in *Fibreboard,* supra, stated, 379 U.S. at 223, 85 S.Ct. at 409.

"Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control. Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment."

The Board asserts that the application of the *Fibreboard* principle by the Fifth Circuit in N.L.R.B. v. Winn-Dixie Stores, Inc., 361 F.2d 512 (5th Cir. 1966) and N.L.R.B. v. American Manufacturing Company of Texas, 351 F.2d 74 (5th Cir. 1965) is controlling. We feel, however, that these cases are distinguishable from the case at bar.

In the *American Manufacturing Company* case, the Court affirmed the Board's findings of flagrant 8(a)(1) and 8(a)(3) violations and an 8(a)(5) violation committed by the employer in contracting out its transporation division at least partially from anti-union motivation without prior consultation with the union. The Court stated that *Fibreboard* ended all doubt as to whether "the decision to *subcontract work* is a subject for mandatory bargaining." 351 F.2d 74, at 80. (Emphasis added.) In the *Winn-Dixie* case, the Court, in pertinent part, affirmed the Board's holding that an employer has the obligation under 8(a) (5)

to consult and bargain with the union about a proposed economically-motivated decision to discontinue the cheese cutting and prepacking phase of its operations. There had been a prior decision of that Court ordering the employer to recognize and bargain with the union after the employer had refused to recognize a majority of signed authorization cards, and had engaged in other unfair labor practices. N.L.R.B. v. Winn-Dixie Stores, Inc., 324 F.2d 502 (5th Cir. 1963). The failure to bargain which was subject of the later case, 361 F.2d 512 (5th Cir. 1966), occurred after the Board had directed the employer to recognize and bargain with the union, and while the enforcement proceedings were pending before the Fifth Circuit. The Court felt "impelled to follow" the authority of the American Manufacturing Company case, supra, in upholding the Board order, and indicated that the case involved a type of subcontracting which was controlled by the principles of Fibreboard.[1] In light of the history of animosity between the union and the employer in each of these cases, we feel that these cases are distinguishable. Further, we feel that the Company's decision here, unlike the decisions in Winn-Dixie and American Manufacturing, involved a managerial decision lying at the core of entrepreneurial control, which was fundamental to the basic direction of the corporate enterprise. Cf. N.L.R.B. v. Northwestern Publishing Company, 343 F.2d 521 (7th Cir. 1965). The application of the Fibreboard principles by the Fifth and Seventh Circuits does not seem persuasive to us on the facts here.

More persuasive we feel is the approach to Fibreboard by the Third and Eighth Circuits. In N.L.R.B. v. William J. Burns Int'l. Detective Agency, Inc., 346 F.2d 897 (8th Cir. 1965), the employer elected unilaterally to terminate its branch office in Omaha and to discharge its security guards there. There was no suggestion of anti-union animus

in the decision. The court carefully reviewed Fibreboard and concluded that, unlike the Fibreboard situation, the employer was not continuing the same work at the same plant under similar conditions of employment. The Court held that the employer had no obligation to bargain concerning the closing of its office. In N.L.R.B. v. Adams Dairy, Inc., 350 F.2d 108 (8th Cir. 1965), the Court held that the employer's decision to terminate a phase of its business and distribute all of its products through independent contractors was not a mandatory subject of collective bargaining. Again, there was no anti-union animus behind the decision. After reviewing Fibreboard, the Court reasoned that the dairy had effected a change in "basic operating procedure in that the dairy liquidated that part of its business handling distribution of milk products. Unlike the situation in Fibreboard, there was a change in the capital structure of Adams Dairy which resulted in a partial liquidation and a recoup of capital investment. To require Adams to bargain about its decision to close out the distribution end of its business would significantly abridge its freedom to manage its own affairs." 350 F.2d 108, at 111.

We feel that the decision in N.L.R.B. v. Royal Plating & Polishing Company, 350 F.2d 191 (3rd Cir. 1965), is equally persuasive. There, the area in which one of the employer's two plants was located was designated for urban renewal. When the Housing Authority exercised an option to purchase the plant, the employer was allowed six months maximum tenancy. Within a month the plant was closed entirely. In holding that the employer had no duty to bargain about making its decision to close the plant, the Court stated:

"The decision to close the Bleeker Street plant rather than move the operations to another location involved a management decision to recommit and reinvest funds in the business.

---

[1] Jones, J., dissented for the reason that the facts appeared to him to disclose a "situation clearly within the exclusive prerogatives of management * * *". 361 F.2d 512, at 517.

\* \* \* There is no question but that the decision to terminate was made for economic reasons. The decision involved a major change in the economic direction of the Company." 350 F.2d 191, at 196.

We feel that the Company's decision here, like these managerial decisions involving the abandonment of uneconomical operations in a particular market as in *Burns,* or a major and basic redirection of an operation through reinvestment or withdrawal of capital as in *Adams* and *Royal Plating,* is in clear contrast to the decision to subcontract in *Fibreboard.*

■ The case which we feel is closest in point analytically with the case at bar is N.L.R.B. v. Rapid Bindery, Inc., 293 F.2d 170 (2d Cir. 1961). In that case, the bindery plant of the employer in Dunkirk, New York, became unable to service adequately a commercial printer in Buffalo which was its principal customer. The employer then formed a new entity in Tonawanda, New York, and transferred its operations from the old plant. This relocation was clearly dictated by economic considerations. The Board held that by failing to give notice to the union of the plans to move and not by opening the subject of the proposed move during pending collective bargaining negotiations the employer failed to bargain collectively and violated § 8(a) (5). In modifying the Board's order, the Court stated that the decision to relocate was not a mandatory subject of collective bargaining, "as it was clearly within, the realm of managerial discretion." 293 F.2d 170, at 176. Here, the Company was faced with the identical threat of becoming unable to serve adequately its principal customer. As in *Rapid Bindery,* the Company's decision to terminate and relocate was a matter of economic necessity. While the *Rapid Bindery* case predates *Fibreboard,* we feel that its reasoning and conclusions are sound and consistent with the principles of *Fibreboard.* Hence, we hold that the Company's decision, based solely on greatly changed economic conditions, to terminate its business and reinvest its

capital in a different enterprise in another location as a minority partner, is not a subject of mandatory collective bargaining within the meaning of § 8(a) (5). A decision of such fundamental importance to the basic direction of the corporate enterprise is not included within the area of mandatory collective bargaining.

■ This is not to hold that the employer is absolved of all duty to bargain with a union when he makes such a managerial decision. Once such a decision is made the employer is still under an obligation to notify the union of its decision so that the union may be given the opportunity to bargain over the rights of the employees whose employment status will be altered by the managerial decision. N.L.R.B. v. Rapid Bindery, Inc., 293 F.2d 170 (2d Cir. 1961); N.L.R.B. v. Royal Plating and Polishing Co., 350 F.2d 191 (3rd Cir. 1965); N.L.R.B. v. Winn-Dixie Stores, Inc., 361 F.2d 512 (5th Cir. 1966). See N.L.R.B. v. Lewis, 246 F.2d 886 (9th Cir. 1957). Such bargaining over the "effects" of the decision on the displaced employees may cover such subjects as severance pay, vacation pay, seniority, and pensions, among others, which are necessarily of particular importance and relevance to the employees. *Royal Plating and Polishing Co.,* supra, 350 F.2d at 196.

■■ Here, the Board affirmed the Trial Examiner's conclusion of law that the Company, "by entering into an agreement with Jones Stevedoring and California Maritime \* \* \* without consultation or bargaining with the Union", violated Section 8(a) (5) and 8(a) (1) of the Act. In the discussion and concluding findings, the Trial Examiner had also rejected the Company's contention that it had bargained with the union with respect to the effect of closing the terminal on the union members. In its brief, the Company asserts that it "does not and never has denied the union's right to bargain about the effect of this decision, as contrasted to the decision upon the guards." However, it

is clear that the Company, by withholding information from the union of its decision to terminate the Los Angeles operations, deterred the union from bargaining over the effects of the shutdown on the employees. The letter from the vice president of the Company to the union, dated three days before the Company was to terminate its Los Angeles facilities, did not satisfy the requirement that the Company give reasonable notice and an opportunity to bargain to the union over the effects of the Company's decision. N.L.R.B. v. Rapid Bindery, Inc., supra; N.L.R.B. v. Royal Plating and Polishing Co, Inc., supra. As to this, therefore, it was an unfair labor practice. We cannot be certain, however, that the Board would have issued the same remedial order had it not reached the erroneous conclusion that the Company was required to bargain collectively concerning the crucial managerial decision. Under these circumstances, we hold that the Board should be given the opportunity to review its order in the light of this opinion, and the matter is remanded to the Board for that purpose.