NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ROYAL OAK TOOL & MACHINE COM-
PANY, R O Manufacturing Company,
Wendell G. Mouw, Garrett H. Mouw
and Robert J. Walls, Respondents.

No. 14789.

United States Court of Appeals
Sixth Circuit.

July 1, 1963.

Gerald Brissman, N. L. R. B., Wash-
ington, D. C. (Stuart Rothman, Gen.
Counsel, Dominick L. Manoli, Associate
Gen. Counsel, Marcel Mallet-Prevost,
Asst. Gen. Counsel, Rosanna A. Blake,
Peter M. Giesey, Attys. N. L. R. B.,
Washington, D. C., on the brief), for
petitioner.

James D. Tracy, Detroit, Mich. (Paul
H. Townsend, Jr., Dykema, Wheat, Spen-
cer, Goodnow & Trigg, Detroit, Mich., on
the brief), for respondents R O Manufac-
turing Company, Wendell G. Mouw, Gar-
rett H. Mouw and Robert J. Walls.

James S. Thorburn, Royal Oak, Mich.
(Davis & Thorburn, Royal Oak, Mich.,
on the brief), for respondent Royal Oak
Tool & Machine Co.

Before MILLER, Circuit Judge, and
McNAMEE and BOYD, District Judges.

McNAMEE, District Judge.

This case is before the Court on the
petition of the National Labor Relations
Board pursuant to Section 10(e) of the
National Labor Relations Act, as amend-

ed, 29 U.S.C., §§ 151 et seq., for the enforcement of its order issued on August 29, 1961 against Royal Oak Tool & Machine Company, (hereinafter Royal Oak), RO Manufacturing Company, (hereinafter RO), Wendell and Garrett Mouw and Robert J. Walls. The Board found that respondents violated Section 8(a) (5) and (1) of the Act by refusing to bargain collectively with the Union [1] as the representative of their production employees included in the bargaining unit set forth in the existing bargaining agreement.

The findings, decision and order of the Board rest upon the following facts as determined by it.

Royal Oak, which has been in existence since the mid-1920's, is primarily a manufacturer of tools and dies for the automotive industry. For this work it employs between 80 and 90 skilled craftsmen known as tool and diemakers. In the early 1940's Royal Oak began producing the R–O grinder, which requires a less skilled labor force, and a grinder division was established in 1946. It was allotted separate space in the plant, had its own accounting system and its own sales manager, William Johnson. For a considerable period prior to 1960, eight men worked in the Grinder Division under Ellwood C. Hemlin. Royal Oak's Grinder Division was a production division in which a standard product was manufactured in quantity as distinguished from tool and diemaking, which is done on an individual basis. The officers and stockholders of Royal Oak during 1950, and for an undisclosed period previous thereto, were Wendell Mouw, president, Garrett Mouw, vice president, Robert Walls, vice-president, John W. Barnowski, secretary-treasurer. Since 1930 Royal Oak has been a member of the Automotive Tool & Diemakers Association and for years has recognized the Union as the exclusive bargaining representative of all its factory production and maintenance employees. The most recent contract between the parties contained a union security clause and a check-off of dues provision applicable to all employees. The general provisions, such as those establishing pensions and vacation benefits, also applied to all employees but the wage and seniority provisions were limited to tool and diemakers. The contract specifically provided for company by company negotiations with the Union relative to wage rates and seniority rules applicable to employees performing production work such as those working in Royal Oak's Grinder Division. The express provisions of the contract relating to production employees are as follows:

"(1) Production employees shall have their own separate seniority list and classifications which shall cover the various occupations in production work;

"(2) Production employees shall be covered by the main body of this Agreement, except as amended by this Exhibit;

"(3) Production wage rates shall be determined by negotiations between the Management and the Union in the shop involved."

As Royal Oak's business in both divisions expanded, space became a problem. To solve this problem and for other business reasons, the company, in 1959, decided to sever its Grinder Division from its Tool and Die Division by selling the grinder business, including its machinery and other assets, to a separate corporation. If this could be accomplished under the "spin-off" provision of the Internal Revenue Code a tax saving would result. Accordingly an application to "spin-off" the Grinder Division and a statement of the business reasons for the transaction was submitted to the Commissioner of Internal Revenue, Washington, D. C., which read in part:

"Due to the dissimilarity of the two businesses conducted, it is desirable from a business standpoint to separate them. A primary objective

1. International United Automobile, Aircraft and Agricultural Implement Workers of America, A.F.L.-C.I.O. and its Local 157.

of the separation is to separate the employees of the two divisions into separate bargaining units. This is desirable because the skilled workers in the Tool Division are represented by the Tool and Die Workers Association, and the high wage rates applicable to these workers are inappropriate to the semi-skilled and unskilled workers employed by the Grinder Division. While it is contemplated that the Grinder Division employees will be organized after the transfer of its operations to a separate corporation, it is assumed that they will not fall within the jurisdiction of the Tool and Die Workers Association, and that consequently the wage rates of this division will be able to be kept at a level commensurate with the work being performed, thereby permitting the company to meet competition.

"A second purpose sought to be achieved by the division is the more effective advertising of the Grinder Division products under a separate corporate name which would reflect the nature of, and be more clearly identifiable with, the product."

The Union received no notice of the proposed "spin-off."

Royal Oak received a favorable advance ruling from the Revenue Service on the proposed "spin-off" and on December 22, 1959, the board of directors authorized the filing of papers necessary to obtain a charter for the new corporation which would be known as RO Manufacturing Company. Later the new company's stock was distributed among the four holders of Royal Oak's common stock, each receiving shares in proportion to those he held in the older corporation. In documents previously submitted to the Revenue Service each of the proposed stockholders stated that should he leave the employ of Royal Oak he expected to sell his stock in both corporations either to the corporation in question or to the remaining stockholders, or some of them. On December 23, 1959, the proposed stockholders of the new com-

pany, which were the same as the stockholders of Royal Oak, met and elected themselves as the board of directors of RO Manufacturing Company. Immediately thereafter the new board held its first meeting and elected the following officers of RO: President, William A. Johnson; Vice President, Ellwood C. Hemlin; Secretary, Robert J. Walls; Treasurer, Wendell G. Mouw.

Johnson had been Sales Manager for Royal Oak's Grinder Division for a number of years. He testified that he learned of his election at RO approximately one month after it occurred. He stated that an advertising man "called me up and let the cat out of the bag," and that the news came as a complete surprise. Thereafter Garrett Mouw (who was not an officer of RO) notified Johnson of his election. Johnson stated his consternation on that occasion was such that he couldn't say whether Mouw told him the identity of the other officers of the new company. Hemlin, who was in charge of the production employees in the Grinder Division of Royal Oak, had a similar job with RO, together with the title and duties of Vice President of the latter corporation. Apparently he learned of his election at about the same time as Johnson. The other two officers of RO, Secretary Walls and Treasurer Wendell Mouw, were majority stockholders in Royal Oak and its Vice President and President, respectively. By bill of sale dated February 16, 1960, retroactive to January 5, 1960, Royal Oak transferred to RO all of its Grinder Division assets, including machinery, office equipment, accounts receivable and the Division's accounts payable. The actual transfer of the machinery occurred over the weekend of February 6–7, 1960. A few days before the transfer the employees in the Grinder Division were called together and told about the move. Johnson was not present on that occasion, being out of town on business for Royal Oak. Nor does it appear that Hemlin was present. Vice President Mouw announced that the jobs at the plants would carry the same classifications and the same rates of pay.

The employees were told they would receive credit for their service with Royal Oak in determining eligibility under RO's pension plan; that there would be no break in hospital benefits and no loss of vacation time earned while working for Royal Oak. When the employees inquired whether they would have a union, they were told in substance that they would have to determine that question for themselves. The product manufactured by RO after the transfer was the same as the one manufactured in the Grinder Division of Royal Oak. The same trade name was used, purchases were made for the most part from the same supplier and the same advertising agency was used. The pattern of sales remained unchanged. John W. Barnowski, Treasurer of Royal Oak, made periodic checks of RO's books. The foreman under whom the men worked was Hemlin, which was the situation that obtained in the Grinder Division of Royal Oak. It was conceded at the hearing by Vice President Mouw of Royal Oak that after the transfer of machinery and employees, RO did not recognize the union as the bargaining representative of its employees. On February 15th, the union shop steward filed a grievance with Royal Oak, pointing out that the men in the Grinder Division were members of a bargaining unit for which Royal Oak had a contract with the union. Thereafter correspondence between Mouw and the Union followed in which a partial explanation was made of the reasons for the spin-off, excluding, however, all reference to the primary objective "of separating the employees of the two divisions into separate bargaining units. It was asserted also that the men went to work on February 8th as "new hires" at RO. On May 20th, 1960, the union, by letter, demanded that Royal Oak bargain with it with respect to the employees "working in your plant located at 31171 Stevenson Highway" which was the address of the RO plant located about one-half mile from the plant of Royal Oak. In its reply, Royal Oak disclaimed having any employees at 31171 Stevenson Highway and suggested any claim of representation should be referred to RO.

Upon the foregoing and other evidentiary facts in the record, the Board held that respondents violated Section 8 (a) (1) and (5) of the Act [2] by refusing to bargain with the Union. The Board held further that the two corporations, Royal Oak and RO, "constitute a single employer for the purposes of bargaining with the Union under the circumstances of this case in view of their common ownership, interlocking officers and directors and the fact that RO produces the same product with virtually the same employees as were employed by the Grinder Division of Royal Oak prior to the 'spin-off.' See, for example, Family Laundry, 121 NLRB 1619." Whereupon the Board issued its order commanding respondents to cease and desist from refusing to bargain with the Union and its Local 157. The respondents contest vigorously the above findings and contend further that the Board erred in approving the Trial Examiner's exclusion of testimony offered by the employees of RO respecting their wishes as to Union representation. The respondents also argue strenuously that the enforcement of the Board's order would not effectuate the policies of the National Labor Relations Act as amended. Further facts will appear in the discussion.

## DISCUSSION

In opposing the Board's determination that the two corporations here involved constitute a single employer for the purpose of bargaining with the Union, Respondents stress the fact that in its enumeration of factors supporting such finding the Board failed to include the all-important factor of common control of labor relations. Respondents assert that in numerous other cases the Board and courts have consistently referred to common formulation and administration of labor policy as being the ultimate test in determining whether two separate entities constitute a single em-

2. National Labor Relations Act.

ployer for the purposes of collective bargaining yet none of the "numerous" cases are cited. We have no doubt, however, that there are such cases nor do we question the importance of common control of labor relations as a factor to be considered in deciding this issue. It is true that in this case the Board made no express reference to this factor but an examination of the record discloses substantial evidence supporting the Board's conclusion that the two corporations in question constitute a single employer for the purpose of collective bargaining. In its statement of reasons for the "spin-off" Royal Oak stated to the Internal Revenue Service—

> "One of the primary objectives of the separation is to separate the employees of the two divisions into separate bargaining units. This is desirable because the skilled workers of the Tool Division are represented by the Tool & Die Workers Association, and the high wage rates applicable to these workers are inappropriate to the semiskilled and unskilled workers employed by the Grinder Division."

Thus, one of the avowed purposes of the "spin-off" was to reduce labor costs in the Grinder Division by maintaining wage rates in that Division at a level "commensurate with the work being performed." Respondents cite and rely upon evidence showing that Vice President Hemlin and President Johnson are responsible for RO's labor policy, grievance adjustments, etc., and that neither of them plays any part in the labor relations of Royal Oak. Respondents rely also upon evidence showing that Wendell Mouw, who plays an important part in labor relations at Royal Oak, is treasurer of RO but his duties as such do not include any responsibility for the labor relations of that company. It is argued that "in fact he plays no part in RO's labor relations." Johnson and Hemlin undoubtedly have some duties relating to employer-employee relations at RO but it is inconceivable that the directors of Royal Oak, now directors of RO as well,

who were deeply concerned about labor costs of the Grinder Division, as evidenced by their statements to the Internal Revenue Service, would play no part in determining the labor policy of RO. It requires a greater degree of credulity than is possessed by this Court to accept the view that Johnson and Hemlin could inaugurate or establish a labor policy at RO that did not meet with the absolute approval of the board of directors. Indeed, the more reasonable inference to be drawn from all the evidence on this subject is that the labor policy at RO, especially in its enduring and more important aspects, is directed and controlled by the board of directors of that company. Concededly, the labor policy of Royal Oak is controlled by the directors who own that company. It is reasonable to suppose that these same men who own RO would be no less concerned with the labor policy of that rapidly growing company. It is unnecessary, however, to rely upon supposition or presumption. A fair evaluation of all the evidence on the subject leads inescapably to the conclusion that the labor policy of RO, as well as the labor policy of Royal Oak, is formulated and administered by the same four men who own all the stock of both companies and constitute the governing board of directors of each.

The Respondents attack the Board's conclusion that at the time of the transfer of the Grinder Division to Royal Oak there was in effect a valid existing collective bargaining agreement which included all involved employees in an appropriate unit recognized and agreed to by all parties thereto. The Board is charged with not considering the evidence bearing upon its conclusion. The charge is grossly unfair and the criticism of the Board's finding is entirely unmerited. The Board expressly stated that "The Trial Examiner properly held that it was the duty of the Respondents in good faith to bargain with the Union with respect to RO's employees in the appropriate unit agreed upon in the existing contract." Moreover, the Board adopted without modification two separate conclusions of

law of the Trial Examiner dealing with this subject. These conclusions are:

"3. All factory, production, and maintenance employees of Royal Oak Tool & Machine Company and its successor, R O Manufacturing Company, except foremen, supervisors, confidential salaried employees, office employees, and plant guards constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(c) of the Act, as amended.

"4. At all times since January 17, 1959, by reason of the aforesaid collective bargaining agreement entered into between the parties herein, the Union has been and now is the duly designated and exclusive representative of all employees in the aforesaid appropriate unit within the meaning of Section 9(a) of the Act, as amended."

 It is, of course, arguable that each company ought to have a separate unit consisting solely of its own employees. Such would seem to be an orderly and logical method of determining appropriate units for collective bargaining. Respondents made such an argument which, considered abstractly, is not without its appeal. But at the time of the spin-off there was an existing bargaining agreement in effect which included tool and die workers and production workers in a single appropriate unit recognized and agreed upon by all parties thereto. The Tool & Die Association, acting for Royal Oak, negotiated with the Union for the wages and seniority rights of the tool and die workers. Royal Oak negotiated with the Union for the lower wage rates applicable to production workers in the Grinder Division and for their seniority rights. The provisions for pensions, vacations and other employee benefits negotiated by the Association were part of the master contract and were applicable to both classes of employees. Thus, instead of separate units and contracts for each class of workers the parties agreed upon one contract and one appropriate bargaining unit consisting of all the affected employees in both divisions. Many of the elements ordinarily found in an appropriate bargaining unit are not present here. There is no mutuality of interest between the tool and die workers and the production workers in wages, hours and working conditions (see: Continental Baking Co., 99 NLRB 777 (1952)), and many other factors found in various appropriate units are missing. But there is the significant fact of agreement between all of the parties to the contract as to the appropriate bargaining unit and the Board's approval of their action. This Court cannot substitute its judgment for that of the Board, and, as said in a different factual context—

"The issue as to what unit is appropriate for bargaining is one for which no absolute rule is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed." Packard Motor Car Co. v. N. L. R. B., 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040.

In the earlier case of Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251, it was held:

Under § 9(b) of the National Labor Relations Act, § 159(b), Title 29 U.S.C.A., the Board has the responsibility of determining the appropriate group of employees for the bargaining unit. It is well settled that it has a wide discretion in its selection and its decision is conclusive unless arbitrary or capricious.

 The decision of the Board on this issue will not be disturbed.

 Apart from the arguments advanced above, the Respondents urge but few reasons in opposition to the Board's determination that their refusal to bargain with the Union constituted an unfair labor practice. Indeed, there is nothing that can be said in effective opposition to the Board's finding on this vital issue. Moving the Grinder Divi-

sion to a separate location a half mile distant from the plant of Royal Oak constitutes no justification for Respondents' refusal to bargain with the Union. National Labor Relations Board v. Williams, [4 Cir.], 195 F.2d 669. It has been held that a complete change of ownership is not sufficient to relieve the successor company from its duty to bargain with the representative of the employees involved. National Labor Relations Board v. Armato, [7 Cir.], 199 F.2d 800. Here there is no transfer of ownership but merely a shifting of the assets, liabilities and employees of the Grinder Division of Royal Oak to a new corporation owned by the shareholders of Royal Oak.

> "An employer cannot decide for itself whether Union has lost its bargaining status, as certified bargaining representative of employees, and deciding that Union has, refused to deal with it further, since that is a matter for determination by the board." National Labor Relations Board v. Sanson Hosiery Mills, 5 Cir., 195 F.2d 350.

See, also: National Labor Relations Board v. Prudential Insurance Co., 154 F.2d 385, (6th Cir.)

Respondents have failed completely to show justification for their refusal to deal with the Union.

■ Respondents claim that the Board erred in supporting the Examiner's exclusion of the proposed testimony of the employees of RO respecting their wishes as to Union representation. The issue here presented is the relevancy of such testimony to the charge that the respondents committed an unfair labor practice by refusing to bargain with the Union designated in the existing collective bargaining agreement. The Respondents complain that the Board made no comment upon the Examiner's ruling in this regard. Yet, in the three and a half pages of their brief devoted to a discussion of this question, Respondents cite no authority, no legal principle nor any rule of evidence that would justify a reversal of the Examiner's ruling. The

contention of Respondents in this respect is overruled.

A few days before the transfer of assets from the Grinder Division to the plant of RO, the employees of that division met with Vice President Mouw and among other things inquired whether they could have a Union under the new setup. They were told in substance that that this was a matter for them to determine. Immediately thereafter the employees held a meeting of their own and voted "to try it without a union." The excluded testimony relates to the vote of the employees and the circumstances under which it was taken. The testimony was wholly irrelevant to any issue before the Board. Moreover, its admission would serve only to indicate that the employees assumed erroneously that as workers for RO they had no further obligation to the union.

We have examined all other contentions of the Respondents but find them to be without merit.

A decree of enforcement may be entered.