COOPER THERMOMETER COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 343, Docket 30880.

United States Court of Appeals
Second Circuit.

Argued Feb. 24, 1967.

Decided April 21, 1967.

Gary Green, Washington, D. C., Attorney (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Abigail Cooley Baskir, Attorney, N. L. R. B.), for respondent.

Russell Lee Post, Jr., Hartford, Conn. (Shipman & Goodwin, Hartford, Conn., Walfrid G. Lundborg, Hartford, Conn., of counsel), for petitioner.

Before FRIENDLY, ANDERSON and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

■ Cooper Thermometer Company, a firm of modest size engaged in the manufacture of commercial-industrial thermometers, seeks review and the National Labor Relations Board asks enforcement of an order, 160 N.L.R.B. No. 150, finding that Cooper had violated § 8(a) (5) and, in consequence, § 8(a) (1) of the National Labor Relations Act by refusing to bargain with United Electrical, Radio and Machine Workers of America, Local 233 (hereafter "the Union") concerning the termination of its operations at Pequabuck, Conn., and their relocation in Middlefield, Conn., 27 miles away. The petitions raise important issues, unhappily little illumined by the Board,[1] concerning the scope of an employer's duties and the appropriate remedies for their violation in cases of plant relocation for economic reasons. We hold the Board was warranted in finding that Cooper violated § 8(a) (5) by refusing to supply information pertinent to, and to bargain over, the transfer of employees to the new plant. However, we do not enforce those parts of the Board's order which are based on the unsupportable assumption that if Cooper had bargained, it would have granted not only preferential hiring but transfer of full seniority and other contractual benefits as well.

Cooper had long recognized the Union as the exclusive bargaining representative for its production and maintenance employees, some 80 in number at the time here relevant. The last agreement, executed in 1962 and modified in May, 1964, was scheduled to expire May 17, 1965. On September 11, 1964, Cooper called a meeting with the Union at which it announced its intention to move from Pequabuck to the Middlefield region for economic reasons, primarily the inadequacy of its existing facilities and the cost of correcting them; it expected to break ground by the end of the month and hoped the new building would be ready by spring or early summer. It said that it had not yet determined its final hiring plan but that it would welcome applications for the new plant from present employees, whom it would consider equally with all other applicants, and that it would attempt to relocate nontransferring employees to other jobs in the Pequabuck area. Notice of the proposed relocation was posted on plant bulletin boards.

Early in January the Union sent Cooper two letters, one of which requested certain information relating to operations at the new plant [2] "for the purpose of entering into negotiations on the terms

---

1. A three-member panel merely endorsed the decision of the Trial Examiner. As will appear below, the lack of adequate discussion is not explicable on the basis that the decision was following well-trodden paths.

2. This included a list of all job classifications and occupations, the number of employees in each, the rate schedules, and the schedule of hours and any other conditions of employment that would vary from those in the Pequabuck contract.

and procedures for an orderly and equitable transition." Cooper's answer professed inability to understand this language, although the company agreed to meet with the Union at an early date "to discuss with you all appropriate matters as may involve the orderly cessation of our manufacturing operations at the Pequabuck plant" and said it might then be "in a better position than we are at the present time to make available to you appropriate information necessary to obtain this objective." In February the Union repeated its request, saying that Cooper had defined the subjects of negotiation too narrowly.

At a meeting on March 1, the Union stated its position that not only the closing of the old but the opening of the new plant were matters for collective bargaining; specifically it wanted to know whether Cooper would bargain as to having present employees go to the Middlefield plant "with the same conditions, seniority and others" and asked to be recognized as the collective bargaining agent at Middlefield. Cooper countered by furnishing and offering to furnish information the Union had requested in January concerning the economic need for the move, but persisted in its refusal to supply job information as to the new plant, which it claimed to be "confidential," except to the extent of saying that rates would average 40¢ an hour less and there would be no piece-work but a day rate with "normal fringes equal to the area."[3] It said it would supply applications to Pequabuck employees but that neither employment nor seniority and other benefits would "transfer automatically" and denied the Union's request for recognition at Middlefield. On the other hand it was willing to discuss vacation or severance benefits to Pequabuck employees who did not transfer. The following day Cooper posted a notice that operations at Pequabuck would cease on May 17, that applications for employment at Middlefield would be available before April 22 with interviews to follow, and that employees desiring help in obtaining other employment should contact their foreman.

By an exchange of letters in March the Union requested negotiations to amend the collective bargaining agreement and Cooper gave the notice of intention to terminate the contract necessary to avoid automatic renewal and asked for a conference. At a meeting on March 22 Cooper made proposals as to vacation pay and insurance; when the Union demanded that Pequabuck employees "be taken" to Middlefield with existing rights and benefits, Cooper refused to do more than offer opportunity for employment on an individual basis. When further meetings on March 29 and April 6 took much the same course, with the Union demanding and the company refusing to transfer employees to Middlefield or to grant any other benefits "that cost money," the Union on April 15 filed an unfair labor practice charge.

At Cooper's instigation, both parties met on May 6 with a state mediator but neither changed its position. The following day the Union requested the names of the Pequabuck employees who had sought and had been accepted for work at Middlefield. Cooper answered that 42 had requested applications, that 29 had filed them, that interviews had been arranged for 21 (with the additional eight interviews still to be arranged), that only 14 had appeared at their interviews, and that of those 14 only four said they wished to work for Cooper in Middlefield. Cooper's letter also set forth criteria the company was using in hiring workers for the new plant, and concluded by stating the company's willingness "to discuss these matters further with you at our next Bargaining Conference." The Union rejoined on May 15, with 52 form letters, each signed by an employee, requesting "a transfer to the new location of the company at Middlefield, Connecticut with full recognition of my seniority, which I acquired

---

3. Average hourly pay at Pequabuck had ranged from $1.45 to $2.97.

in your service at Pequabuck through the many collective bargaining agreements" between Cooper and the Union. Cooper returned these to the Union, writing that it had "met with the Union on numerous occasions and negotiated on Union demands that included the right of transfer, referred to in your letter, and on which we failed to reach agreement."[4] A final meeting with the mediators on June 2 produced only a reiteration of attitudes previously expressed.

Public transportation between Pequabuck and the Middlefield plant is virtually unavailable. The approximate travel time by private car is 45 minutes. Nearly 80% of the Pequabuck employees were women, many of them "married or second employees in the family." In early August Cooper wrote 83 letters to former workers saying that it needed their experience at Middlefield and that most Pequabuck employees then working there were receiving hourly rates equal to or higher than those formerly paid and inviting them to telephone collect. Fourteen who called were not sufficiently interested to come for an interview; of the eleven who did only two were hired but left after a few days because, on the testimony of a company witness, "it was too far to travel." On the other hand, one employee, a former union vice-president, who came for an interview—the only employee called by the General Counsel as a witness—testified that he was offered $1.58 per hour to do the work for which he had been paid $2.76 at Pequabuck. The company also offered him a job requiring more skill than the one he had previously had, which would have paid as much as $2.12 an hour, but he also refused this because he "couldn't afford to travel that distance for that money." Ten of the organized employees and virtually all the supervisors did transfer.[5]

The Trial Examiner concluded that by failing to furnish the Union with job data relating to the Middlefield plant, refusing to negotiate concerning conditions of transfer, and insisting on dealing with employees on an individual basis, Cooper had violated § 8(a) (5). Because of the geographical proximity of the two plants, "of all the evidence as to employees' desires respecting transfer," and of "the absence of convincing evidence" that a majority of the Pequabuck employees would not have transferred if Cooper "had fulfilled its obligation under the Act," he thought it was "not unreasonable to infer" that those workers would have transferred had Cooper bargained fully and that consequently the company had further violated § 8(a) (5) by refusing to recognize the Union as bargaining representative at Middlefield. He recommended that Cooper be required to do what it had unlawfully refused and "offer immediate reinstatement and make whole those unit employees at the Pequabuck plant who were discharged as a result of Respondent's unlawful actions." A footnote stated that "reinstatement shall be to the employee's former or substantially equivalent positions, without prejudice to their seniority and other rights and privileges" and that "backpay shall be computed at the rates provided in the Pequabuck plant contract." The Board accepted these recommendations without discussion.

■■ We have no difficulty in approving the Trial Examiner's first conclusion. Though we assume that, as Cooper maintains, the existing contract, which in any event it could and did terminate by May 17, 1965, did not apply to the new plant, Oddie v. Ross Gear and Tool Co., 305 F.2d 143 (6 Cir.), cert. denied, 371 U.S. 941, 83 S.Ct. 318, 9 L.Ed. 2d 275 (1962); Zdanok v. Glidden Co., 327 F.2d 944, 952 (2 Cir.), cert. denied,

4. It was stipulated that only 24 of the 52 signers filed an application for employment other than this form letter, and that 21 of these were interviewed of whom 20 indicated lack of interest and the remaining one was hired.

5. Included in the ten are the two who were hired in August but left within three days because of the difficulty of commuting to the new plant.

377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); cf. Zdanok v. Glidden Co., 288 F.2d 99, 90 A.L.R.2d 965 (2 Cir.), cert. granted on another issue, 368 U.S. 814, 82 S.Ct. 56, 7 L.Ed.2d 22 (1961), aff'd 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed. 2d 671 (1962), the Board may reasonably interpret § 8(a) (5), as explicated in § 8 (d), as requiring an employer relocating his plant not merely to give reasonable notice to a recognized union and to negotiate the terms of the shutdown, as we held in NLRB v. Rapid Bindery, Inc., 293 F.2d 170 (1961), but also to discuss with it the basis on which employees may transfer and, in that connection, to give information as to jobs in the new plant essential to the intelligent formulation of the union's requests. The most important interest of workers is in working; the Board may reasonably consider that an employer does not fulfill his obligations under § 8(a) (5) if he refuses even to discuss with employees' representatives on what basis they may continue to be employed. This is not novel doctrine. See Brown-McLaren Mfg. Co., 34 N.L.R.B. 984 (1941); Brown Truck & Trailer Mfg. Co., 106 N.L.R.B. 999 (1953); Bickford Shoes, Inc., 109 N.L. R.B. 1346 (1954). While Cooper was not bound to agree to the Union's demand that the Pequabuck employees "be taken" to Middlefield with everything unchanged or even to less burdensome proposals, the Board could properly fault it for an attitude which, in effect, ousted the Union from any role in negotiating what might be offered to employees desiring to transfer. As was said in Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 214, 85 S.Ct. 398, 13 L.Ed. 2d 233 (1964), "although it is not pos-

sible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation."

The finding of a further § 8(a) (5) violation in Cooper's refusal to recognize the Union as bargaining agent at the new plant raises a much more difficult issue. The difficulty stems from the hypothetical nature of the question on which decision turns—would a majority of the Middlefield employees have wished to be represented by the Union if Cooper had not committed the initial violation? While the sole fact firmly known is that only ten Pequabuck employees transferred, the Board might well have been warranted in finding that a majority would have done so if the workers could have brought the Pequabuck contract with them—even though we do not take the problem of traveling 54 miles every day by private car so lightly as the Trial Examiner did.[6] On the other hand we doubt that we would sustain such a finding based, as the Examiner's apparently was, on the assumption that Cooper would have agreed to the full recognition of seniority stated in the May 7 letters of the 52 employees [7] but only to that, even if there were reason to suppose that bargaining might have led to such an agreement on Cooper's part. The letters were *post litem motam,* the signers had little to lose by offering to transfer on a condition they knew would not be met, and the geographical facts and the history of the applicants, interviewees and transferees raise grave question how seriously these letters can be taken.[8]

6. There was no evidence whether the residences of the Pequabuck workers were so located as to make car pools or other cost-sharing devices practicable or as to other employment opportunities in the Pequabuck area which might have rendered the time and cost of the 54-mile daily drive unattractive even at the old rates.

7. The Examiner's finding seems to have been based on the supposition that if

Cooper had bargained, it would have agreed at least to hire the Pequabuck employees preferentially with full seniority, since he found it "apparent" that "there was little desire on the part of the employees" to transfer on any terms less than those "outlined in their application which was prepared by the Union."

8. In addition to the evidence already cited strongly suggesting that the Pequabuck employees found it unprofitable to travel

However, we do not need to decide that since § 8(a) (5) did not require Cooper to recognize the seniority of the Pequabuck employees; its duty was only to talk in good faith, and the evidence makes it fairly plain that such talk would not have that result.

Doubtless because of the difficulty in determining how many employees would have transferred, the Board has long been rather cautious before ordering an employer to recognize a union designated at the old plant as the bargaining agent at the new. Until very recently this has been done only when the distance was so short that there was considered to be no change in the bargaining unit, see Royal Oak Tool & Machine Co., 132 N.L.R.B. 1361 (1961), enforced 320 F.2d 77 (6 Cir. 1963); Royal Optical Mfg. Co., 135 N.L.R.B. 64 (1962); Hurley Co., 136 N.L.R.B. 551 (1962), enforced 310 F.2d 158 (8 Cir. 1962), or there was proof that the majority at the new plant were union workers from the old, see Die Supply Corp., 160 N.L.R.B. No. 99 (1966).[9] Until 1965 the only case arguably constituting an exception, save for Rapid Bindery, 127 N.L.R.B. 212 (1960), was one where the employer had moved for the very purpose of avoiding a continuation of collective bargaining, the union was not even told of the move until it had happened, and the two plants were only 12 miles apart within the Los Angeles Metropolitan Area. California Footwear Co., 114 N.L.R.B. 765 (1955), enforced sub nom. NLRB v. Lewis, 246 F.2d 886 (9 Cir. 1957). In its opinion in that case the Board distinguished Brown Truck & Trailer Mfg. Co., 106 N.L.R.B. 999 (1953), where it had refused to order recognition by an employer who had likewise failed even to notify its union of the move, on the grounds that in *Brown* there was no proof of evil motive and that problems of transportation to a town 30 miles away "raised serious doubts that a majority of employees would have transferred to the new plant even if the Respondent there had bargained in regard to transfers." 114 N.L.R.B. at 768–769. The Board had similarly refused to issue an order for recognition at the new plant in Brown-McLaren Mfg. Co., 34 N.L.R.B. 984 (1941), where the move was some 40–50 miles, and in Bickford Shoes, Inc., 109 N.L.R.B. 1346 (1954), where it was but 28. When in *Rapid Bindery* the Board did order recognition of the union as bargaining agent at the new plant, there some 50 miles away, we declined to enforce this, noting, 293 F.2d at 177, that the union did not appear to represent any of the employees at the new plant and that if a substantial number of the employees there should designate the union, it could petition for an election. Later the Board ordered recognition of the old union at a new plant in Miami to which the employer had moved from New York City, Garwin Corp., 153 N.L.R.B. 664 (1965), but the move itself was found to violate § 8(a) (3) and the decision can be read as limited to such

to Middlefield for the lower wages paid there, Tomasetti, the Union's international representative and chief negotiator who was called as a witness by the General Counsel, testified that at the rates of pay offered by Cooper at the Middlefield plant, Pequabuck employees "would have to be crazy to go there." Audette, an officer and negotiator for Cooper, named several of the 52 signers of the Union's letter who did not appear for interviews because they did not want to travel to Middlefield. One of these, Belisle, was enthusiastically sought by the company but refused to transfer even when offered 50¢ per hour more than he had been earning. And of the ten Pequa-

buck employees who did transfer, at least three quit within a short time because of the burden of commuting.

9. The Board itself has recognized this to have been its historic policy: "[I]n cases where an employer relocates a plant at a distant site in order to avoid statutory bargaining obligations, the Board has not imposed an obligation to bargain at the new location until the statutory representative could reestablish its representative status at the new location." Garwin Corp., 153 N.L.R.B. 664, 666 (1965), enforced in part sub nom. Local 57, ILGWU v. NLRB, 374 F.2d 295 (D.C.Cir. 1967). See also 30 NLRB Ann.Rep. 29, 115–17 (1965).

"runaway" cases. The Court of Appeals for the District of Columbia, by a divided vote, nevertheless denied enforcement of this portion of the order, Local 57, ILGWU v. NLRB, 374 F.2d 295 (1967), even though it accepted the Board's finding that the company had moved in order to eliminate the union—a suggestion not even made by the General Counsel in this case—and the order, unlike that here, contained a limit on the contract bar rule to one year unless the union established a majority at the new plant.

■ The Board urges that here the new plant was somewhat nearer than in *Rapid Bindery* where we denied enforcement of a recognition order, and that it was much nearer than in *Garwin;* however, Cooper's conduct was nothing like so gross a violation of the Act as was *Garwin's* against which a § 8(a) (3) finding was sustained. Exercising our reviewing authority in the manner we have been instructed, Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we cannot conclude that this record fairly supported a finding that a majority of the Pequabuck employees, 80% of them women, would have transferred to Middlefield on any basis to which collective bargaining could reasonably have been anticipated to lead. Although the Board may expand its remedies in the light of experience, it can hardly expect a court to look favorably on an order which without explanation imposes a sanction on this employer that was denied in the two cases most closely comparable, *Brown Truck & Trailer Mfg. Co,.* supra, and *Bickford Shoes, Inc.,* supra, when the circumstances relied on for the new departure in *Garwin Corp.,* a ruling which did not commend itself to a majority of the Court of Appeals for the District of Columbia—the closing of the old plant in violation of § 8(a) (3) and a runaway to a point so distant that a reinstatement order would necessarily be almost totally ineffective, see 153 N.L.R.B. at 665–66—are absent. We therefore deny enforcement of so much of the order as would require Cooper now to recognize the Union as representative of the Middlefield employees, without prejudice to such further order concerning recognition as the Board may find proper, after appropriate hearing, within a reasonable time after Cooper has made the reinstatement offer whose enforcement we here decree.

■ Since Cooper violated § 8(a) (5) by refusing to discuss the terms of transfer with the Union, requiring an offer of preferential reinstatement was proper. See Note, Labor Law Problems in Plant Relocation, 77 Harv.L.Rev. 1100, 1107–08 (1964). But reinstatement on what basis? The Trial Examiner said that "in accordance with the usual requirements," this "shall be to the employees' former or substantially equivalent positions, without prejudice to their seniority and other rights and privileges." We are not sure whether or not this means at the Pequabuck rates of pay. Neither are we vouchsafed any light on the source of "the usual requirements"; if the Examiner was referring to cases of discriminatory discharge, these are inapposite since in such cases there would be no reason to doubt that the discharged employee would otherwise have continued at his existing rate of pay. We think the reinstatement offer should be on whatever basis emerges from good faith bargaining between Cooper and the Union; recognizing the likelihood that such bargaining will produce little change from the current practices at Middlefield, we believe this would still be a much closer approximation to what bargaining would have yielded at the proper time. A sanction for refusal to bargain that would treat the guilty party as if he had agreed to what the other party demanded although the evidence shows he would have done nothing of the sort would give insufficient respect to Congress' direction in § 8(d) that the obligation to bargain "does not compel either party to agree to a proposal or require the making of a concession."

Award of back pay to workers who would have transferred to a new plant had there been proper bargaining is also something of a new departure. No such

remedy was imposed in the leading relocation cases of the past decade—*Brown Truck & Trailer; Bickford Shoes, Inc.;* or *California Footwear Co.,* in that case deliberately so, see the Examiner's discussion, 114 N.L.R.B. at 806, and while the remedy was invoked in Rapid Bindery, we denied enforcement. The rather apparent motivation for the Board's current practice of utilizing this sanction in relocation cases, see Standard Handkerchief Co., 151 N.L.R.B. 15 (1965); Die Supply Corp., 160 N.L.R.B. No. 99 (1966); Garwin Corp., 153 N.L.R.B. 664 (1965), enforced in part sub nom. Local 57, ILGWU v. NLRB, 374 F.2d 295 (D.C.Cir. 1967), is that an order merely requiring an employer to bargain with the union that had represented workers at an abandoned plant and offer preferential reinstatement is rather mild medicine whereas a recognition order runs into the difficulties we have mentioned and may be unfair to workers at the new plant. We think the Board is justified in requiring back pay in such cases for workers who would have transferred if proper bargaining had occurred. See Fibreboard Paper Prods. Corp. v. NLRB, supra, 379 U.S. at 215–217, 85 S.Ct. 398, 13 L.Ed.2d 233. But the question again is back pay at what rate? The Examiner's solution—back pay at the rate provided in the old contract—would make the workers not merely whole but very much more; carrying over the old pay scales is something that Cooper was demonstrably unwilling to do and the Union rather obviously lacked economic power to compel. Yet the function of the Board's remedy is to restore "the situation, as nearly as possible, to that which would have obtained but for" the illegal action, Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). Furthermore, to compute back pay on this basis would hopelessly complicate the determination of which employees would have transferred if proper bargaining had occurred. While the Board would naturally regard an actual transfer for a substantial period as satisfactory proof that an employee would have transferred, the prospect of a two-year back-pay award computed at an unrealistically high rate would be so powerful an incentive for such a transfer as to undermine an otherwise reasonable inference. This difficulty in determining who would have transferred under proper bargaining, as well as the harsher impact of an order dealing with an entire work force, cf. Fibreboard Paper Prods. Corp. v. NLRB, supra, 379 U.S. at 216, 85 S. Ct. 398, 13 L.Ed.2d 233, sufficiently distinguishes the decisions enforcing back-pay orders for failure to bargain over subcontracting on which the Board relies. NLRB v. American Mfg. Co., 351 F.2d 74, 75 (5 Cir. 1965) (subcontracting motivated by desire to escape union); NLRB v. Winn-Dixie Stores, Inc., 361 F.2d 512 (5 Cir.), cert. denied 385 U.S. 935, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966); NLRB v. Johnson, 368 F.2d 549 (9 Cir. 1966), enforcing 155 N.L.R.B. 674. Cf. Local 60, United Brotherhood of Carpenters v. NLRB, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961). Recognizing there can be no ideal solution, we think that in this case back pay also should be based on the results of the bargaining now ordered or, if this has none, on the Middlefield scale. Here again we are also influenced by the greater severity of the order concerning this employer as contrasted with past treatment of more egregious violators of § 8(a) (5) and the lack of reasoned explanation for the difference.

We thus grant enforcement in part and deny it in part. The Board shall submit a decree in conformity with this opinion, in accordance with Rule 13(*l*) of this Court.