INTERNATIONAL UNION, UNITED AU-
TOMOBILE, AEROSPACE, AND AG-
RICULTURAL IMPLEMENT WORK-
ERS OF AMERICA (UAW), Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Pierce Governor Company, Inc.,
Intervenor.

No. 20948.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 25, 1967.

Decided March 6, 1968.

Mr. John A. Fillion, Detroit, Mich., with whom Messrs. Stephen I. Schlossberg, Washington, D. C., and Bernard F. Ashe, Detroit, Mich., were on the brief, for petitioner.

Mr. Gary Green, Attorney, National Labor Relations Board, with whom Mr. Arnold Ordman, General Counsel, Mr. Dominick L. Manoli, Associate General Counsel, Mr. Marcel Mallet-Prevost, Asst. General Counsel, and Mr. Julius Rosenbaum, Attorney, National Labor Relations Board, were on the brief, for respondent.

Messrs. James S. Haramy, Clyde L. Peterson, Indianapolis, Ind., Guy Farmer, and John A. McGuinn, Washington, D. C., were on the brief for intervenor.

Before BAZELON, Chief Judge, PRETTYMAN, Senior Circuit Judge, and TAMM, Circuit Judge.

PRETTYMAN, Senior Circuit Judge.

Petitioner is a Union which for more than twenty years prior to the present proceeding had been the bargaining representative of the production and maintenance employees of Pierce Governor Company, Inc., a small manufacturing company operating in Anderson, Indiana. The Union filed an unfair labor practice charge [1] against the Company. The Board, reversing the trial examiner, dismissed, and the Union petitions for review.

Pierce Governor Company, Inc., respondent-intervenor, informed the Union at a contract renewal negotiation meeting in December, 1964, that it was consider-

---

1. Sec. 8(a), Labor Management Relations Act, 1947, 61 STAT. 140, 29 U.S.C. § 158(a):

"SEC. 8(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

\*　　\*　　\*　　\*　　\*

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)."

ing a plant relocation because it would be "economically advantageous". The Company's plant at Anderson was sixty-five years old and ramshackle. It was open to complaint on account of health and safety conditions, including obnoxious odors, a heating problem, leaking roof, defective wiring and plumbing. The trial examiner in the present proceeding found "[i]ts dilapidated condition * * notorious."[2] Because of this state of the building the Union sought to obtain a contract provision allowing it to strike over health and safety conditions. After further deliberation the Company announced that its intention to remove had become firm, and it proceeded to design and build a new plant some thirty-five miles away at Upland, Indiana, saying that community had made the "most attractive offer". That the move was precipitated by legitimate economic reasons[3] and was in no way anti-union is not disputed. This is an important basic factor in the dispute now before us.[4]

At the time of this announcement the Company and the Union were already negotiating for a renewal of their existing bargaining agreement,[5] and in the following thirteen months, between December, 1964, and February, 1966, negotiations ran the gamut of ordinary labor relations. It is helpful to keep in mind that these parties were not newly acquainted but were long-time adversaries at the bargaining table. The topics discussed at these sessions included several directly related to the relocation of the plant, including, but not limited to, an interim contract for the Anderson plant,

unemployment compensation, and pension payments. The relocation and its consequences were the direct subject of many conversations which erupted from time to time at these meetings. Gradually the positions of the parties became irreconcilable. The Union insisted that the Company "guarantee" the transfer of all employees from Anderson to Upland and that it (the Union) be recognized as the exclusive bargaining agent at the new site. The Company's position was that it would give consideration to any Anderson employee who applied at Upland, with retention of seniority for all those hired, but would not "guarantee" transfer, because some of the employees at Anderson were physically unable to perform a full day's work; others, although physically capable, had not been delivering a full day's work; and still others had disqualified themselves from employment because of objectionable conduct during the strike which the Union had initiated in November, 1964, when negotiations on the original Anderson contract had broken down. The Company said it would not recognize the bargaining representatives from the old plant until such time as that Union became the certified bargaining representative at the new plant or could convince the Company that it represented a majority of employees there. The ensuing impasse went to the Board.

■ The Board held, *inter alia*,[6] that the Company had met its obligation to bargain with the Union concerning the effects of the move to Upland on Anderson employees. We think this finding was supported by substantial evidence.

2. It was stipulated that as of September 1, 1964, the physical condition of the plant at Anderson had deteriorated to a point where its continued operation without proper repair and remodeling created unsafe and unhealthful working conditions.

3. Local 57, International Ladies' Garment Workers' Union AFL–CIO v. NLRB, 126 U.S.App.D.C. 81, 374 F.2d 295, cert. denied, 387 U.S. 942, 87 S.Ct. 2078, 18 L.Ed.2d 1332 (1967).

4. NLRB v. Rapid Bindery, Inc., 293 F.2d 170 (2d Cir. 1961). *See* NLRB v.

Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).

5. The parties began bargaining in September, 1964, for a new agreement to replace the one which terminated on October 30, 1964.

6. The Board also found that the economic strike which began in November, 1964, was never converted into an unfair labor practice strike, because the Company engaged in no conduct violative of the Act.

Throughout the period of negotiations there were many meetings and much correspondence. A Union official identified twelve meetings by date in 1964. They continued into 1965. Officials, ranging from the Company's attorney to its president, were involved, as were local, regional and international representatives of the Union, often in the presence of a federal mediator. Witnesses in the present proceeding identified many subjects discussed. The record is replete with proposals, counter-proposals and concessions by the Company. At a stenographically reported meeting in the presence of a federal mediator, the Company attorney offered to bargain about the relative advantages or disadvantages of the move itself. The Company, having set out its rationale for refusing to "guarantee" the transfer of all employees from Anderson to Upland, proposed that those whose physical capabilities were in question be examined by an independent arbitrator, and that subject was discussed. The Company assured the Union that no jobs had been promised at Upland and that all applications would be given equal consideration, including such factors as age, health, qualifications, and prior employment records. It offered severance benefits in the nature of separation pay to those who did not choose to go, could not go, or were not selected. It offered to close the Anderson plant to enable the employees there to obtain unemployment compensation and to go to the Federal Unemployment Service to endeavor to arrange for relocation of employees seeking jobs in the Anderson area; other discussions covered seniority and pension payments.

The Company had a well-defined position on transfers, which it stated, explained and discussed at great length. This position did not change throughout the bargaining, but such a course is not unlawful.[7] The Act does not require yielding of a position fairly maintained, and there is an explicit provision to that effect in the statute.[8] So it seems to us the Board was correct in concluding that the Company did bargain concerning the effects of the relocation on Anderson employees.

■ The other principal point presented upon this petition, according to the prehearing conference stipulation, is whether the Board properly found that the Company was under no obligation to bargain with "the Union" as to the terms and conditions of employment at the new Upland plant. This question turns upon what may be properly considered "the Union" for purposes of bargaining. The problem frequently arises and is generally clouded.[9] The smog evolves from uncertainty as to the nature and function of each of the various units involved— international unions, locals, bargaining units, bargaining committees, local-regional-international representatives, and the relationship among them. In the case now at bar all these entities appear.

7. NLRB v. Insurance Agents' International Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); NLRB v. American National Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); NLRB v. Southwestern Porcelain Steel Corp., 317 F.2d 527 (10th Cir. 1963); NLRB v. Mayer, 196 F.2d 286 (5th Cir. 1952); Aluminum Ore Co. v. NLRB, 131 F.2d 485, 147 A.L.R. 1 (7th Cir. 1942).

8. Sec. 8(d), Labor Management Relations Act, 1947, 61 STAT. 142, 29 U.S.C. § 158 (d):
   "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, *but such obligation does not compel either party to agree to a proposal or require the making of a concession*: * * *." (Emphasis supplied.)

9. See Rose, *Relationship of the Local Union to the International Organization*, 38 VA.L.REV. 843 (1952), and Note, *Labor Law Problems in Plant Relocation*, 77 HARV.L.REV. 1100 (1964).

Petitioner identifies itself both in its petition for review and in the charges it filed in its complaint as the International Union, United Automobile, Aerospace, and Implement Workers of America (UAW). It states its position to be, however, that the Company violated Section 8(a) (1) and (5) of the Act "By refusing to bargain with the Anderson local (while willing, for a time, to bargain with a different UAW local at the new location) * * *."

The Local was not the certified bargaining representative of these employees. The trial examiner found as a fact that the International was certified as the "exclusive bargaining agency" for them. He continued that since 1941 contracts had been made between the Company "and the International and its Local 940, jointly (herein called 'the Union'), as the 'exclusive bargaining agency' for the employees * * *." The Board made similar findings. Thus it clearly appears that the International was the certified bargaining representative but that the International and the Local "as an integral part" of the joint bargaining agent negotiated and signed the contracts. How the Local became engrafted into the process is not shown on the record. At any rate it was never the certified bargaining agent nor an independent bargaining entity; at most it was a *de facto* agent.

The Company at no time refused to bargain with the certified bargaining representative, the International. Quite the contrary is the fact. On January 28, 1965, the Company wrote to the Director of the Regional Office of the UAW a long letter outlining "the principles generally acceptable to us." The first of these was "Recognition of a UAW-CIO Local at Upland." And the second was "Consummation of a 5-year contract."

The letter referred to prior conversations. It was prefaced with the statement "That we are not obligated to recognize Local 940" for any purpose other than at Anderson, but stated its willingness to "arrive at some agreement with you" about Upland. After considerable delay the Regional Director wrote the Company, replying to each point in the Company's letter. He said in part: "POINT 1. Your offer to recognize UAW-AFL-CIO as the bargaining agent for the Pierce Governor employees at the Upland plant is, of course, acceptable." He expressed preference for a three-year contract. Thus it is quite clear that the Company did not fail or refuse to recognize the International Union.

■ We also think the Board was correct if the situation is viewed from the standpoint of the Local. In the first place, where the International has been certified, an employer could hardly be held guilty of an unfair labor practice for failing to recognize a local union which was not certified. And we think this rule must apply even if the Local acts as an integral part of the single joint representative of the employees at the bargaining table. An uncertified organization cannot, it seems to us, inject itself, or be injected by a friendly parent, into a labor relationship where there is a certification, in the face of the statutory provisions as to exclusiveness, certification, etc.[10] This is not to say that such an organization, if it enjoys employee approval, may not enjoy a preferred status in understanding the problems peculiar to a particular locality and enter into negotiations, sit at the bargaining table, or make proposals regarding these problems. But beyond this, Local 940, whatever its status at Anderson, was shown not to be the representative of the employees at Upland. The

---

10. Sec. 9(a), Labor Management Relations Act, 61 STAT. 143 (1947), 29 U.S.C. § 159(a):

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: * * *."

Union, when challenged by the Company, failed to establish, or even to claim, that it represented a majority of the employees at Upland.

■ It is certainly clear that the Upland employees had a right to bargain about their own working conditions and therefore to name their own bargaining agent. This right is basic in our labor law.[11] It is also clear that the Company was prohibited from impinging upon that choice.[12] It is prohibited from bargaining with anybody except a representative selected by a majority of employees.[13]

The record in this case shows that the Union representative assured the Company representative at a meeting "that it was not essential that Local 940, as an entity, continue to be, at Upland, the 'local' part of the joint representative of the employees there but that, after an agreement had been reached with the International covering the Upland plant, a new local could be established and an election scheduled at which the Upland employees could select their own bargaining committee."

■ It is established that, although a plant relocation does not in itself invalidate a union's representative status,[14]

such a relocation, or any other substantial change in the enterprise which is accompanied by a change in employee personnel sufficient to justify a reasonable doubt concerning the continued majority, is a valid premise for a company's demand for assurance on the point,[15] provided anti-union policy or intent does not taint the company's position.[16]

In the case at bar the Company gave its Anderson employees ample notice [17] of the move and of the right to apply for employment at the new site. The fact of the move was emphatically asserted to the bargaining committee at negotiation meetings. It was testified that at one such meeting two of the three bargaining committee members said that under no circumstances, regardless of what rate of pay was offered "or anything", would they be wanting to transfer to Upland. At one point the Union representative indicated that, after eliminating certain employees who had reached retirement age, those who could not pass physical qualifications, and those who had obtained other employment and wanted to remain at their new jobs, only about forty Anderson employees (there were some two hundred at the new plant) would be interested in transferring. At

---

11. Sec. 7, Labor Management Relations Act, 61 STAT. 140 (1947), 29 U.S.C. § 157:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities * * *."

12. Sec. 8(a) (1), (2), (3), Labor Management Relations Act, 61 STAT. 140 (1947), 29 U.S.C. § 158(a) (1), (2), (3):

"SEC. 8.(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *;

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *."

13. *Supra* note 10.

14. California Footwear Company, 114 N.L.R.B. 765, 767–769 (1955), *enforced in part sub nom.* NLRB v. Lewis, 246 F.2d 886 (9th Cir. 1957). A similar analysis applies where there is a change in ownership of an employing enterprise; where the seller's enterprise itself remains otherwise substantially unchanged, the seller's duty to bargain devolves upon the purchaser. NLRB v. Downtown Bakery Corp., 330 F.2d 921 (6th Cir. 1964).

15. Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

16. *Supra* note 3.

17. *Supra* note 4, at 176.

one time the lawyer representing the Company and the Regional Director for the UAW agreed that the Upland area was of an "economic make-up" different from that at Anderson and that to "let this thing bog down in terms of transfer rights if there were any was a mistake."

We think the business of changing jobs is of no small consequence and may indeed involve a number of perplexing problems. Moving one's job for even so short a distance as forty miles may involve not only such direct factors as long drives and different times for arising in the morning and reaching home in the evening each day, but also collateral matters such as comparative labor customs and people, problems of schools, both as to the impact of change and as to comparable quality, social affiliations, interests and habits. These and many other factors which are small in a textbook thesis loom large and real in the lives of ordinary people, especially those who live and work in small towns.

The first few production employees at Upland were hired during February of 1965. By August 1st the employee complement was 212, and thereafter there were at least 190 employees on the payroll. Only one person worked at both Anderson and Upland. The Company wrote the Union on October 5th that "No Anderson employee has presented himself at Upland for employment at the Upland plant." The Union made no effort to count its membership at the Upland plant, and in this proceeding it made no claim that it did represent a majority of those employees. The fact is that employees formerly at Anderson who were members of Local 940 did not constitute a majority of employees at Upland.

In sum, then, on this part of our problem the Company had reasonable grounds to believe that a majority of the people who applied and were hired at Upland did not belong to Local 940. When the Company reflected its concern and posed the question by offering to recognize any union which could show membership of a majority of its employees, the burden would seem to shift to the Union to make such a showing. Certainly the burden does not rest with the Company to show a lack of majority. If the question had been membership in the International, perhaps a different question would be presented. But in the situation here depicted it would seem correct to say, as the Board did, that the Union had failed to sustain its charge that the Company committed an unfair labor practice by failing to recognize Local 940 as the bargaining agent of its Upland employees.

The Union says, and the trial examiner held, that it need not sustain the burden of showing a majority at the new plant, that since the relocation of the plant was so short a distance from the old site, and since the management and the business remained the same, there is a presumption that a majority of the employees remained the same. The Union relies upon Cooper Thermometer Company v. NLRB,[18] a decision of the Second Circuit. But we do not find in that case what the Union and the examiner found there. The Company there did not bargain concerning the transfer. The court held that under those circumstances a presumption of continuation arose. In the case at bar there was bargaining, and so no premise exists for this presumption. Moreover we cannot presume to be a fact something shown by recorded evidence not to be the fact.

We are of opinion that the Board was not in error in its determination of the problems presented here, and its disposition of the matter is therefore

Affirmed.

BAZELON, Chief Judge (dissenting).

I read the majority opinion to say that the Upland plant was not a continuation of the old Anderson facility. I disagree. But if my brethren are correct it is wholly unnecessary to reach the question of representation at the new plant.

18. 2 Cir., 376 F.2d 684 (1967).

**764**

We would need to decide whether Local 940 and the International should continue to represent the old employees and replacements at the new plant only if, as the Examiner found, this was a continuation situation. Without such continuation or employee consent, Local 940 and the International do not represent the workers at Upland and the question of the identity of the bargaining representative there does not arise.

Accordingly, anything the majority says about representation at Upland has no bearing on the union's Section 8(a) (5) complaint which was based on the assumption that the Anderson unit continued. In any event the distinction drawn by the majority between Local 940 and the International for purposes of representation is untenable. Employees have the right to bargain through representatives of their own choosing.[1] And the Act does not prohibit the employees from adding an additional bargaining agent provided the certified representative is not excluded.[2] The fact that only the International was "the certified bargaining agent" does not exclude the Local which had jointly represented the employees for 26 years, nor does it abrogate the company's agreement in its last contract, signed by the International and the Local, recognizing "Local Union 940 * * * and the International Union * * * as the exclusive bargaining agency for all the company's employees."

The Court is correct in not relying on Cooper Thermometer v. NLRB[3] to control the continuation issue, since the company here was always willing to bargain about the impact of the plant relocation as it was not in *Cooper*. However, I cannot agree with my brethren that the move from Anderson to Upland was the type of substantial change in the enterprise "which is accompanied by a change in employee personnel sufficient to justify a reasonable doubt concerning the con-

tinued majority. * * *" Considering that (1) the Examiner found that "the removal of the plant from Anderson to Upland had no greater significance * * * than would have had its removal across the street," (2) 85% of the old supervisory and clerical personnel were able to work at the new plant even though they undoubtedly faced many of the problems which the majority identifies as arising from plant moves, and (3) because there has been no suggestion that the employees here were not the principal family wage earners, I question whether absent a violation by the employer of Section 8(a) (5) there would have been any issue of the unions' continued status at the new Upland plant.

I would remand to the Board to reconsider the continuation issue in light of the foregoing.

---

1. N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893 (1936).

2. NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 350, 78 S. Ct. 718, 2 L.Ed.2d 823 (1958).

